323-04/MEU/LJK
FREEHILL HOGAN & MAHAR, LLP
Attorneys for Plaintiff
HBC Hamburg Bulk Carriers GmbH & Co. KG
80 Pine Street
New York, NY 10005
(212) 425-1900
(212) 425-1901 fax
Michael E. Unger (MU 0045)
Lawrence J. Kahn (LK 5215)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------x

HBC HAMBURG BULK CARRIERS GMBH & CO. KG,

Plaintiff,

-against-

PROTEINAS Y OLEICOS S.A. DE C.V.,

Defendant.

-----------------------------------------------------------x

**04 CIV 6884 (NRB)**

*****ECF CASE*****

**VERIFIED COMPLAINT**

Plaintiff HBC HAMBURG BULK CARRIERS GMBH & CO. KG (hereinafter, "HBC"), through its attorneys Freehill Hogan & Mahar, LLP, as and for its Verified Complaint against Defendant PROTEINAS Y OLEICOS S.A. DE C.V. (hereinafter, "PO"), alleges upon information and belief as follows:

1. This is an admiralty and maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure in that it involves a claim for the breach of a maritime contract of affreightment. The case also falls within the Court's admiralty and maritime jurisdiction pursuant to 28 U.S.C. §1333. Finally, the Court has jurisdiction pursuant to 9 U.S.C. §203, which provides that any action or proceeding falling under the Convention for the Recognition and Enforcement of Foreign Arbitral Awards shall be deemed to arise under the laws and treaties of the United States.

2.    At all times relevant hereto, Plaintiff HBC was and still is a foreign business entity duly organized and existing under the laws of a foreign country with a registered office at Osdorfer Landstrasse 233, 22549 Hamburg, Germany.

3.    At all times relevant hereto, Defendant PO was and still is a foreign business entity duly organized and existing under the laws of a foreign country with an address at Calle 17, No. 409-A Tercer Nivel, Esquina 20 y 28 Ciudad Indust, Merida, YUC, 97288, Mexico.

4.    On or about March 8, 2004,  Plaintiff HBC entered into a maritime contract with Defendant PO, in the form of a North American Grain charter party pursuant to which HBC agreed to provide vessels to PO for the carriage of three cargoes of soyabeans from ports in Tubaro, Brazil to ports in Progresso or Altamira, Mexico (hereinafter, "the Charter Party").

5.    The Charter Party was subsequently amended to provide for two additional voyages (Voyages 4 and 5). A copy of the Charter Party with addenda, is annexed hereto as **Ex. 1**.

5.    Pursuant to the Charter Party, Defendant PO declared Voyages 1, 2 and 3 and Plaintiff HBC supplied the M/V SEA LAVENDER, M/V IRINI F and M/V ZENOVIA respectively in fulfillment of Plaintiff's obligations.

6.    Plaintiff HBC earned demurrage in the amount of $141,336.11 in connection with Voyage 1 on the M/V SEA LAVENDER and $36,302.09 in connection with Voyage 2 on the M/V IRINI F. Defendant PO was given a credit for despatch in the amount of $15,208.33 in connection with Voyage 3 on the M/V ZENOVIA.

7.     In total, Defendant PO incurred demurrage and other charges related to Voyages 1, 2 and 3 in the amount of $162,428.11, and Plaintiff HBC has made a demand for the outstanding demurrage and other charges related to Voyages 1, 2 and 3, but Defendant PO has failed or otherwise refused to pay and said amount remains past due and owing to Plaintiff.

8.     Defendant PO's failure to pay the outstanding demurrage is a breach of the Charter Party contract.

9.     Pursuant to Addendum 3 to the Charter Party, Defendant PO was required to declare the destination and quantity for Voyage No. 4 on or before August 6, 2004. Plaintiff HBC contacted Defendant PO and requested that PO declare Voyage No. 4, but Defendant PO failed or otherwise refused to make its required declaration of Voyage No. 4.

10.     HBC calculates its losses arising out of PO's failure or refusal to declare Voyage No. 4 to be $516,071. This calculation assumes PO would have declared their minimum cargo obligation and that HBC had opted to lift an additional 10%, as was HBC's entitlement under the Charter Party . HBC also assumes that it would have been able to provide tonnage to perform the business at a rate of $19,159 per day, which was the prevailing rate at the time for vessels of the type required by PO for performing a similar service.

11.     Pursuant to Addendum 3 to the Charter Party, Defendant PO was required to declare the quantity and destination for Voyage No. 5 on or before August 20, 2004. Plaintiff HBC contacted Defendant PO and requested that PO declare Voyage No. 5, but

Defendant PO failed or otherwise refused to make its required declaration of Voyage No. 5.

12.    HBC calculates its losses arising out of PO's failure or refusal to declare Voyage No. 5 to be $516,071. This calculation assumes PO would have declared their minimum obligation under the Charter Party and that HBC had opted to lift an additional 10%, as was HBC's entitlement. HBC also assumes that it would have been able to provide tonnage to perform the business at a rate of $19,159 per day, which was the prevailing rate at the time for vessels of the type required by PO for performing a similar service.

13.    As a result of the foregoing, Defendant PO is thus in actual default of the Charter Party in respect of the duty to declare Voyages 4 and 5 and in actual default of the Charter Party in respect of the failure or refusal to pay the demurrage and related charges that are currently past due.

14.    Accordingly, HBC calculates its total estimated damages to be **$1,194,570.11**.

15.    Despite due demand for its claim of $1,194,570.11, PO has refused or otherwise failed to pay HBC.

16.    The Charter Party, at Clause 44, provides that all disputes arising under the Charter Party shall be resolved by arbitration at London according to English law. Plaintiff HBC specifically reserves its right to arbitrate the substantive matters at issue herein.

17.    Upon information and belief, and after investigation, Defendant PO cannot be "found" within this District for the purpose of Rule B of the Supplemental Rules of

Certain Admiralty and Maritime Claims, but Plaintiff is informed that Defendant has, or will shortly have, assets within this District comprising of, *inter alia*, cash, funds, credits, wire transfers, accounts, letters of credit, freights, sub-freights, charter hire and/or sub-charter hire, of, belonging to, due or for the benefit of Defendant PO ("ASSETS"), including but not limited to ASSETS at, being transferred through, or being transferred and/or wired to or from Bank of New York, Credit Suisse, Bank of America N.A., JP Morgan Chase Bank or others, including but not limited to ASSETS in accounts maintained at Bank of New York account numbers FTS0407086586400 and/or FTS0407091036400, and/or ASSETS in accounts maintained at Bank of America N.A. account numbers 012034001MER and/or 010474001MER, and/or ASSETS in an account maintained at JP Morgan Chase Bank account number 211-06-0020540-S.

18. The total amount sought to be attached pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims by HBC against PO includes (i) the calculated demurrage and related charges damages of $162,428.11; (ii) the calculated damages for the failure or refusal to declare Voyage No. 4 of $516,071; (iii) the calculated damages for the failure or refusal to declare Voyage No. 5 of $516,071; (iv) interest which is recoverable in London arbitration estimated to the time of the entry of the arbitral award of $224,838;[1] (v) estimated attorneys fees and disbursements, which are recoverable in London arbitration of $110,000; and (vi) estimated arbitrators fees, which are recoverable in London arbitration of $61,000, is as nearly as can presently be estimated to be in the amount of **$1,590,408.11**.

[1] Interest is calculated at 7% over a period of 2½ years on the base amount of the claim comprising of the demurrage and related charges added to the damages for the two voyages that were not declared. Rules of London arbitration allow for recovery of interest at prime plus 1% compounded, typically, at quarterly rests, and 2½ years is typical of the length of time from initiation of London arbitral proceedings to entry of an award thereon.

WHEREFORE, Plaintiff HBC prays:

a.      That process in due form of law according to the practice of this Court may issue against Defendant PO, citing it to appear and answer the foregoing, failing which a default will be taken against it for the principal amount of the claim of $1,194,570.11 plus interest;

b.      That if Defendant PO cannot be found within this District pursuant to Supplemental Rule B that all assets of Defendant PO, up to **$1,590,408.11**, to cover the base amount of the claim, estimated interest, estimated attorneys fees and the estimated cost of the arbitration be restrained and attached, including but not limited to any cash, funds, credits, wire transfers, accounts, letters of credit, freights, sub-freights, charter hire, sub-charter hire, and/or other assets of, belonging to, due or for the benefit of Defendant PO, by Bank of New York and/or Credit Suisse and/or Bank of America N.A. and/or JP Morgan Chase Bank and/or any other garnishee(s) upon whom a copy of the Process of Maritime Attachment and Garnishment issued herein may be served;

c.      That the Court enter an order directing Defendant PO to appear and respond in arbitration pursuant to the terms of the Charter Party; and

d.      That the Plaintiff have such other, further and different relief as this Court may deem just and proper in the premises.

Dated: New York, New York
        August 25, 2004

FREEHILL HOGAN & MAHAR, LLP
Attorneys for Plaintiff
HBC Hamburg Bulk Carriers GmbH & Co. KG

By: ______________________________
Michael E. Unger (MU 0045)
Lawrence J. Kahn (LK 5215)

80 Pine Street
New York, NY 10005
Telephone (212) 425-1900
Facsimile (212) 425-1901

## ATTORNEY VERIFICATION

State of New York )
) ss.:
County of New York )

Michael E. Unger, being duly sworn, deposes and says:

1. I am a member of the law firm of Freehill Hogan & Mahar, LLP, attorneys for the Plaintiff in this action, I have read the foregoing Verified Complaint and know the contents thereof, and the same is true to the best of my knowledge, information and belief.

2. The sources of my information and the grounds for my belief are communications from our client and documents provided by our client regarding the claim.

3. The reason this verification is made by an attorney and not by the Plaintiff is because the Plaintiff is a foreign entity, none of whose officers are presently within this Judicial District.

Michael E. Unger (MU 0045)

Sworn to before me this
25th day of August, 2004

Notary Public

GLORIA J. REGIS HOSEIN
Notary Public, State of New York
No. 01RE6065625, Qualified in Kings County
Certificate Filed in New York County
Commission Expires October 22, 2005



Exhibit 1



**Code Name: Norgrain**

RECOMMENDED BY
NORTH AMERICAN EXPORT GRAIN ASSOCIATION
THE BALTIC AND INTERNATIONAL MARITIME CONFERENCE
CHAMBER OF SHIPPING OF THE UNITED KINGDOM
FEDERATION OF NATIONAL ASSOCIATIONS OF SHIP BROKERS AND AGENTS

AMENDED 1/7/74

# NORTH AMERICAN GRAIN CHARTERPARTY 1973

ISSUED BY THE ASSOCIATION OF SHIP BROKERS AND AGENTS (U.S.A.) INC.

Hamburg, 18th March, 19 2004

**Owners** — IT IS THIS DAY MUTUALLY AGREED, between HBC HAMBURG BULK CARRIERS GMBH & CO. KG., Hamburg

*Note: Delete as appropriate* — ~~Owners~~ / Disponent Owners / ~~Time-chartered Owners~~ / ~~Chartered Owners~~ of the S.S./M.V. ~~Self/Non~~ Self Trimming Bulk Carrier / ~~Tween-Decker~~ / ~~Tanker~~ HBC - TBN Call Sign ... Telex ...

**Description of Vessel. See Clause 64.** — ~~Built~~ ... at ... of ... ~~tons of 2,240 lbs. deadweight all told, or thereabouts,~~ and with a grain cubic capacity available for cargo of ... ~~cubic feet (including~~ ... ~~cubic feet in self-bleeding wing spaces)~~

In clear, clean, unobstructed main holds only

**Classification.** — Classed highest Lloyd's or equivalent ... in Lloyd's Register of Shipping now Trading

*Note: latest vessel's itinerary.*

**Charterers** — and PROTEINAS Y OLEICOS S.A. de C.V. MERIDA of Yucatan / Mexico Charterers

**Loading Port(s)** — 1.—That the said vessel, being tight, staunch and strong and in every way fit for the voyage, shall with all possible ~~convenient~~ speed proceed to one safe port at one safe berth always afloat, always accessible at TUBARAO - see also Clause 62 ... and there load 3 cargoes ~~at~~ ... ~~safe loading berth(s) in Charterers' option,~~

**Description of Cargo.** — always afloat, ~~a full and complete*~~ ~~part*~~ ~~cargo~~ in bulk of SOYABEANS stowing maximum 47'/mt for each shipment one grade only - 30.000 mts to PROGRESO or ALTAMIRA, port in Charterers' option / 40.000 mts to ALTAMIRA - First cargo 15th/30th April: 40.000 mts 10% more or less in Owners' option to Altamira, see also Clause 62

~~at Charterers' option~~ ... ~~tons of~~ ~~2,240 lbs.*~~ / ~~1,000 kilos.*~~ ... 10 % more or less, quantity at Owners' option.

**Notice and Loading Port Orders. see Clause 68** — ~~2.—Owners are to give Charterers (or their Agents) (telegraphic address "~~ ... ~~" telex number:~~ ... ~~) 15 and 7 days' notice of vessel's expected readiness to load date, and approximate quantity of cargo required with the 15 days' notice, such quantity to be based on a cargo of Heavy Grain, unless the cargo composition has been declared or indicated.~~

~~The Charterers are to be kept continuously advised by telegram/telex of any alteration in vessel's readiness to load date.~~

~~Master to apply to~~ ... ~~(telegraphic address "~~ ... ~~") for first or sole loading port orders 144 hours before vessel's expected readiness to load date but not sooner than 144 hours before the laydays in Clause 4 and Charterers or their Agents are to give orders for first or sole loading port within 72 hours of receipt of Master's application, unless given earlier.~~

~~Orders for second port of loading, if used, to be given to the Master not later than~~ ...

~~Master is to give Charterers (or their Agents) 72 and 12 hours' notice of vessel's estimated time of arrival at first or sole loading port together with vessel's estimated readiness to load date.~~

**Vessel Inspection.** [an independent surveyor of]

3.—~~Vessel to load under inspection of National Cargo Bureau, Inc. in U.S.A. ports or of the Port Warden in Canadian ports. Vessel also to load under inspection of a Grain Inspector licensed/authorized by the United States Department of Agriculture pursuant to the U.S. Grain Standards Act and/or of a Grain Inspector employed by the Canada Department of Agriculture, as required by the appropriate authorities.~~

If Vessel ~~loads at other than U.S. or Canadian ports, she~~ is to load under inspection of such national and/or regulatory bodies as may be required.

Vessel is to comply with the rules of such authorities, and shall load cargo not exceeding what she can reasonably stow and carry over and above her Cabin, Tackle, Apparel, Provisions, Fuel, Furniture and Water. Cost of such inspections shall be borne by Owners.

**Laydays/ Cancelling.** see Clause 62.

4.—~~Laytime for loading, if required by Charterers, not to commence before 0800 on the ............ day of ............ 19............~~

~~Should the vessel's notice of readiness not be tendered and accepted as per Clause 17 before 1200 on the ............ day of ............ 19............, the Charterers or their Agents shall at any time thereafter, but not later than one hour after the notice of readiness is tendered, have the option of cancelling this Charterparty.~~

**Destination.**

5.—On being so loaded, the vessel shall proceed [with all possible speed] to one safe port at one safe berth always accessible at PROGRESO, where Charterers guarantee min. 31' swad, ......... or in Charterers' option one safe port at one safe berth always accessible at ALTAMIRA ............

as ordered by Charterers/~~Receivers~~*, and deliver the cargo, according to Bills of Lading at............ ~~safe discharging berths in Charterers' option~~, vessel being always afloat, on being*/~~having been~~* paid freight as per Clauses 8 and 9.

**Discharging Port Orders.** See Clause 65.

~~Master to apply by radio to Charterers'/Receivers'* Agents (telegraphic address "............") for first or sole discharging port orders 96 hours before vessel is due off/at*............ and Charterers/Receivers* Agents are to give first or sole discharging port orders by wireless within 48 hours of receipt of Master's application unless given earlier. If Master's application is received on a Saturday, the time allowed to Charterers/Receivers* (or their Agents) shall be 72 hours instead of 48 hours.~~

~~Orders for second and/or third port(s) of discharge are to be given to the Master not later than arrival at first or subsequent port.~~

~~Master to radio Charterers/Receivers* (or their Agents) 72 and 24 hours notice of vessel's estimated time of arrival at first or sole discharging port. Charterers/Receivers* (or their Agents) are to be kept continuously advised by radio/telegram/telex of any alterations in such estimated time of arrival.~~

**Bills of Lading.**

6.—The Master is to sign Bills of Lading as presented [based on shore / elevator figures] ~~on the North American Grain Bill of Lading form~~ without prejudice to the terms, conditions and exceptions of this Charterparty. If the Master elects to delegate the signing of Bills of Lading to his Agents he shall give them such power of attorney in writing, copy of which is to be furnished to Charterers.

**Rotation of Ports.**

7.—~~Rotation of loading ports is to be in Owners'*/Charterers'* option.~~

~~Rotation of discharging ports is to be in Owners'*/Charterers'* option, but if more than two (2) ports of discharge are used rotation is to be geographic............ to............~~

**Freight.**

8.—Freight to be paid as follows: US$ 44,-/mt basis 30.000 mts 10% more or less in Owners' option ALTAMIRA/PROGRESO
US$ 42,-/mt basis 40.000 mts 10% more or less in Owners' option ALTAMIRA

............

~~per ton of 2,240 lbs./1,000 Kilos*.~~

~~Charterers have the option of ordering the vessel to load at............ in which case the rate of freight to be ............ per ton of 2,240 lbs./1,000 kilos.*~~

~~Charterers/Receivers have the option of ordering the vessel to discharge at ............ in which case the rate of freight to be ............ per ton of 2,240 lbs./1,000 kilos*.~~

~~If more than one port of loading and/or discharging is used, the rate of freight shall be increased by............ per ton of 2,240 lbs./1,000 kilos* for each additional loading and/or discharging port on the entire cargo.~~

* Delete as appropriate.

Clean on Board

less undisputed loadport despatch or plus loadport demurrage, whatever applicable, within three (3) banking days after signing

**Freight Payment.** 100 %

9.—(a) ~~If vessel discharges in the United Kingdom including Northern Ireland, freight shall be payable by~~ Receivers*/~~Charterers*~~ ~~concurrently with discharge on out-turn weight, to Owners or their designated Agents at~~ ............ in ............ currency.

(b) ~~For all other destinations,~~ freight shall be ~~fully~~ prepaid ~~on surrender of signed~~ Bills of Lading in..marked "Freight payable as per Charter Party".................. in ............United States.................. currency to ..as per Clause 63.. ~~on Bill of Lading weight,~~ discountless, not returnable, vessel and/or cargo lost or not lost. Freight shall be deemed earned as cargo is loaded on board.

Once the Bills of Lading have been signed, and Charterers call for surrender of Original Bills of Lading ~~against freight payment above,~~ it will be incumbent upon Owners or their Agents to comply immediately with such call for surrender ~~during office hours, Mondays to Fridays inclusive.~~ See also Clause 60.

(c) ..........................................

(d) Demurrage / despatch to be settled after final discharge, together with final accounts within 30 days after receipt by Charterers respectively Owners' relevant documents including laytime statements, Statements of Facts and Notices of Readiness for all ports.

over and above spout-trimming, to be for Owners' time, risk and expense.

**Cost of Loading and Discharging.** spout-

10.—(a)* Cargo is to be loaded, ~~stowed,~~ trimmed (to Master's satisfaction in respect of seaworthiness) free of expense to the vessel. Any additional trimming required, Cargo is to be discharged free of expense to the vessel (to Master's satisfaction in respect of seaworthiness).

(b)* ~~Cargo is to be loaded, stowed and trimmed at Owners' expense.~~ ~~Cargo is to be discharged free of expense to the vessel (to Master's satisfaction in respect of seaworthiness).~~

**Stevedores at Loading Port(s) and Discharging Port(s)**

11.—Stevedores at loading Port(s) are to be appointed by Charterers*/~~Owners*~~ and paid by Charterers.*/~~Owners.*~~

~~If stevedores are appointed by Owners, they are to be approved by Charterers at loading port(s), and such approval is not to be unreasonably withheld.~~ Stevedores at discharging port(s) are to be appointed and paid for by Charterers/~~Receivers*~~.

In all cases, stevedores shall be ~~deemed to be the servants of the Owners and shall~~ work under the supervision of the Master.

**Bulk Carrier and Wing Spaces**

12.—(a) The vessel is warranted to be a self-trimming bulk carrier.*/~~non-self-trimming bulk carrier.*~~

to be loaded into clear, clean and unobstructed main holds only. No cargo to be loaded into wing tanks / deep tanks or any other inaccessible spaces.

(b) Cargo ~~may be loaded into wing spaces if the cargo can bleed into centreholds. Wing spaces are to be spout-trimmed; any further trimming in wing spaces and any additional expenses in discharging are to be for Owners' account, and additional time so used is not to count as laytime or time on demurrage.~~

**Overtime.**

13.—(a) Expenses

(i) All overtime expenses at loading and discharging port(s) shall be for account of the party ordering same.

(ii) If overtime is ordered by port authorities or the party controlling the loading and/or discharging terminal or facility all overtime expenses are to be for ~~equally shared between the Owners and~~ Charterers.*/~~Receivers.*~~ account.

(iii) Overtime expenses for vessel's officers and crew shall always be for Owners' account.

~~(b) Time Counting~~

~~If overtime be worked during excepted periods ordered by Owners the actual time used shall count.~~
~~If overtime be worked during excepted periods ordered by Charterers/Receivers* the actual time used shall not count.~~
~~If overtime be worked during excepted periods ordered by port authorities or the party controlling the loading and/or discharging terminal or facility half the actual time used shall count.~~

(c) ~~SHINC (Sundays and Holidays Included)~~

~~Section (b) shall not apply if SHINC has been agreed.~~

**Separations.**

14.—~~Cost of cargo separations, including labour used for laying same, to be for Charterers' account unless required by Owners, in which case all resultant expenses shall be borne by the Owners. Separations ordered by Charterers shall be made to Master's satisfaction (but not exceeding the requirements of the competent authorities).~~

**Securing.**

*Delete para. (a) or (b) as appropriate.*

15.—(a) For Owners' account

and / or regulatory body

Any securing (bagging or strapping, etc.) required by Master, National ~~Cargo Bureau or Port Warden~~ for safe trim/stowage to be supplied by and paid for by Owners, and time so used not to count as laytime or time on demurrage. Bleeding of bags, if any, at discharge port(s) to be at Owners' expense, and time actually lost is not to count.

(b) ~~For Charterers' account~~

~~Any securing (bagging or strapping, etc.) required by Master, National Cargo Bureau or Port Warden for safe trim/stowage to be supplied by and paid for by Charterers, and time so used to count as laytime or time on demurrage. Bleeding of bags, if any, at discharge port(s) to be at Charterers'/Receivers'* expense.~~

**Opening/Closing Hatches.**

16.—(*a*)* ~~At each loading an[illegible] discharging port, cost of first opening and last closing of hat[illegible] and removal and replacing of beams, if any, shall be for Owners' account. Cost of all other opening and closing of hatches, removal and replacing of beams shall be for Charterers'/Receivers'* account.~~

(*b*)* At each loading and discharging port, cost of all opening and closing of hatches and removal and replacing of beams, if any, shall be for Owners'* ~~Charterers'/Receivers'~~* account, provided local regulations permit.

**Time Counting.**

17.—(*a*) *Notice of Readiness and Commencement of Laytime*

Notification of vessel's readiness to load ~~and/or discharge~~ at ~~the first or sole~~ loading ~~and/or discharging~~ port, shall be delivered in writing at the office of Charterers/~~Receivers~~ (or their Agents) between the hours of 0900 to 1700 on all days except Sundays and holidays, and between the hours of 0900 to 1200 on Saturdays. Charterers/~~Receivers~~ shall not be required to accept notice of readiness to load ~~or discharge~~ on Saturdays after 1200 or on Sundays or holidays. Such notice of readiness shall be delivered when vessel is in the loading or discharging berth and is in all respects ready to load/discharge, including Free Pratique where applicable. If the loading and/or discharging berth is unavailable, Master may tender vessel's notice of readiness from a lay berth or anchorage within the commercial limits of the port subject to the provisions of Clause 17 paragraph (*b*).

Following receipt of notice of readiness to load ~~or discharge~~ as above, laytime will commence at 0800 on the next day. Sundays and holidays excepted ~~(for Saturdays see Clause 18 (e)). If SHING agreed,~~ the exception of Sundays and holidays ~~(as well as the possible exception of Saturdays under Clause 18 (e))~~ shall not apply.

Time actually used before commencement of laytime shall count half.

(or by cable / VHF, provided vessel arrived within the commercial limits of the port or at the port's customary anchorage place.) (or their Agents) Saturdays

At discharge: Notification of vessel's readiness to discharge at discharging port shall be delivered in writing or by cable/VHF provided vessel arrived within the commercial limits of the port or at the port's customary anchorage place, at any time, day/night, Sundays/holidays included.

(*b*) *Waiting for Berth*

If the vessel is prevented from entering the commercial limits of the loading/discharging port(s) because the first or sole loading/discharging berth or a lay berth or anchorage is not available, or on the order of the Charterers/~~Receivers~~ or any competent official body or authority, and the Master warrants that the vessel is physically ready in all respects to load or discharge, the time spent waiting at a usual waiting place outside the commercial limits of the port or off the port shall count against laytime. Such laytime shall count from vessel's arrival at such usual waiting place and will continue to run as per clause 18 until any of the aforesaid conditions cease to be operative and vessel is so notified by Charterers/~~Receivers~~ or their Agents or any competent authority. ~~If after entering the commercial limits of the loading port, vessel fails to pass inspections as per clause 17 (d) and requires more than four hours SHINC to pass such inspections from the time of initial failure to pass, the time spent waiting outside the commercial limits of the port as per lines 142-144 shall not count and the provisions of lines 153-154 are not to apply; but, if said vessel passes inspections within said four hours, any delay in commencing loading directly attributable to its failure to pass initial inspections shall not count as laytime or time on demurrage.~~

Time so used is to ~~be added to laytime (or time on demurrage) used for loading/discharging the entire cargo if Clause 18(b) and 18(c) apply and is to~~ be added to laytime (or time on demurrage) used for loading and discharging the entire cargo ~~if reversible laydays apply or if Clause 18(a) applies.~~

Once the vessel has reached a place within the commercial limits of the port, notice of readiness is to be tendered in accordance with the provision of lines 130 to 135 and laytime is to begin to count in accordance with lines 136 to 137.

~~At first or sole loading port the cancelling date shall be extended by the number of running days SHINC rounded to the nearest day spent waiting outside the commercial limits of the port for berth (in accordance with the provisions of lines 140 to 144).~~

(*c*) ~~*Subsequent Port(s)*~~

~~At second or subsequent port(s) of loading and/or discharging, laytime or time on demurrage shall resume counting from vessel's arrival in loading or discharging berth if available or from vessel's arrival within the commercial limits of the port if berth is unavailable, otherwise the provisions of Clause 17 paragraph (b) shall apply.~~

(*d*) Inspection **See Clause 66.**

~~At the loading port(s), Master's notice of readiness shall be accompanied by pass of the National Cargo Bureau/Port Warden and Grain Inspector's certificate of vessel's readiness in all compartments to be loaded, for the entire cargo covered by this Charterparty as per Clause 3. In the event that vessel loads in subsequent port(s) and is required to re-pass inspections in these ports, any time lost thereat in securing the required certificate shall not count as laytime or time on demurrage.~~

**Laytime.**

18.—~~(a) Vessel is to be loaded and discharged within .................... working days of twenty-four (24) consecutive hours each (weather permitting), Sundays and Holidays~~ ~~included (SHINC).*~~ ~~excepted (SHEX).*~~

Saturdays

(*b*) Vessel is to be loaded ~~within~~ at the average rate of 7.000 tons per 1.000 kilos per weather working days of twenty-four (24) consecutive hours each ~~(weather permitting)~~, Saturdays, Sundays and Holidays ~~included (SHINC).*~~ excepted (SHEX).* unless used.

(*c*) Vessel is to be discharged at the average rate of .................... 10.000 .................... tons of ~~2,240 lbs.*~~ 1,000 kilos.* per weather working day of twenty-four (24) consecutive hours ~~(weather permitting)~~, Sundays and Holidays included (SHINC)* ~~excepted (SHEX)*~~ on the basis of the Bill of Lading weight.

(*d*) Laydays shall be ~~reversible*~~ non-reversible*

~~(e) Notwithstanding any custom of the port to the contrary, Saturdays shall not count as laytime at loading and discharging port or ports where stevedoring labour and/or grain handling facilities are unavailable on Saturdays or available only at overtime and/or premium rates. In ports where only part of Saturday is affected by such conditions, as described above, laytime shall count until the expiration of the last straight-time period. Where six or more hours of work are performed at normal rates, Saturday shall count as a full lay day.~~

(*f*) In the event that the vessel is waiting for loading or discharging berth, no laytime is to be deducted during such period for reasons of weather unless the vessel occupying the loading or discharging berth in question is actually prevented from working ~~grain~~ due to weather conditions in which case time so lost is not to count.

* Delete as appropriate.

**Demurrage/ Despatch Money.** [Typed rider: loss in Owners' option and US$ 34,000.– for 40,000 mts 10% more or less in Owners' option]

19.—Demurrage ~~at loading and/or discharging ports,~~ if incurred, to be paid at the rate of US$ 30,000.– for 30,000 mts 10% more or ........ per day or *pro rata* for part of a day and shall be paid by Charterers ~~in respect of loading port(s) and by Charterers/Receivers* in respect of discharging port(s)~~. Despatch money to be paid by Owners at half the demurrage rate for all laytime saved ~~at loading and/or discharging ports.~~
Any time lost for which Charterers/~~Receivers~~ are responsible, which is not excepted under this Charterparty, shall count as laytime, until same has expired, thence time on demurrage.

**Shifting.** [Typed rider: over and above the costs which would have been incurred if the vessel had proceeded direct to subsequent loading or discharging berth,]

20.- (*a*) Shifting expenses and time

(i) Cost of shifting between loading berths and cost of shifting between discharging berths, including bunker fuel used, to be for Owners'* ~~Charterers'/Receivers'*~~ account, ~~time counting~~, but laytime used in shifting to count.

(ii) If vessel is required to shift from one loading or discharging berth to a lay berth or anchorage due to subsequent loading or discharging berth(s) not being available, all [additional] ~~such~~ shifting expenses, ~~as defined above~~ shall be for Owners'* ~~Charterers'/Receivers'*~~ account, ~~time counting~~, and laytime used in shifting to count.

(iii) Cost of shifting from lay berth or anchorage to first loading or first discharging berth to be for Owners' account.

(*b*) Shifting in and out of the same berth
If vessel is required by Charterers/~~Receivers~~* (or their Agents) to shift out of the loading berth or the discharging berth and back to the same berth, one berth shall be deemed to have been used, but shifting expenses from and back to the loading or discharging berth so incurred shall be for Charterers'/~~Receivers'~~* account and laytime or time on demurrage shall count.

**Gear and Lights.** [Typed rider: Owners warrant that vessel is able to safely sail between loading and discharging ports berths / anchorages, with empty and / or slack holds as per vessel's approved Grain Stability Booklet, without requiring any securing (bagging or strapping, etc.).]

21.- ~~This clause shall not apply if vessel is gearless, or Chartered as such. If required, Master to give free use of vessel's cranes*/winches* and power to drive the gear, runners, ropes and slings as on board, and crane drivers*/winchmen* from the crew. If shore regulations do not permit the crew to work cranes*/winches* then shore crane drivers*/winchmen* if used, to be for Owners'*/Charterers'* account at loading port(s) and Owners'*/Receivers'/Charterers'* account at discharging port(s). Time lost on account of breakdown of vessel's gear essential to the loading or discharging of this cargo is not to count as laytime or time on demurrage, and if this Charterparty calls for Charterers/Receivers* to pay for cost of loading or discharging any stevedore standby time charges incurred thereby shall be for Owners' account.~~

If required, Master shall give free use of the vessel's lighting as on board for night work.

**Seaworthy Trim.** [Typed rider: berths / places /]

22.—If ordered to be loaded or discharged at two ~~or more~~ ports, the vessel is to be left in seaworthy trim to Master's satisfaction (not exceeding the requirements of the Safety of Life at Sea Convention as applied in the country in which such ports are situated) for the passage between ports at Charterers' expense at loading and at Charterers'/Receivers'* expense at discharging ports, and time used for placing vessel in seaworthy trim shall count as laytime or time on demurrage.

**Draft/ Lighterage.**

23.—~~Owners warrant that vessel's deepest salt water draft shall not exceed .................. feet .................. inches on completion of loading and .................. feet .................. inches on arrival at first or sole discharging port.~~
Should the vessel be ordered to discharge at a place to which there is not sufficient water for her to get the first tide after arrival without lightening, and lie always afloat, laytime is to count as per Clause 17 at a safe anchorage for similar vessels bound for such a place and any lighterage expenses incurred to enable her to reach the place of discharge is to be at the expense and risk of the cargo, any custom of the port or place to the contrary notwithstanding, but time occupied in proceeding from the anchorage to the discharging berth is not to count as laytime or time on demurrage.
Unless loading and/or discharging ports are named in this Charterparty, the responsibility for providing safe berths and/or safe ports of loading and/or discharging lies with the Charterers/~~Receivers* provided Owners have complied with the maximum arrival draft limitations in Lines 210 to 211.~~

**Car Decks, etc.**

24.—~~It is understood that if this vessel is fitted with car decks, container fittings and/or any other special fittings not connected with the carriage of grain in bulk, any extra expenses incurred in loading and/or discharging as a result of the presence of such car decks, container fittings and/or special fittings are to be for Owners' account. Time so lost shall not count as laytime or time on demurrage.~~

**Dues at German Ports**

25.—~~Quay/Weight or Tonnage dues in Germany shall be for Charterers'/Receivers'* account.~~

**St. Lawrence Seaway Tolls.**

26.—~~All St. Lawrence Seaway and/or Welland Canal tolls on vessel and/or cargo assessed by Canadian and United States Authorities are to be paid and borne by Owners.~~

**Water Pollution Clause.**

27.—~~Owners warrant to have secured and to carry aboard the vessel a U.S. Federal Maritime Commission Certificate of Financial Responsibility as required under the U.S. Water Quality Improvement Act of 1970. In addition, owners agree to comply with any and all Official Regulations pertaining to water pollution as applicable. Any time lost on account of vessel's non-compliance with Government and/or State and/or Provincial regulations pertaining to water pollution shall not count as laytime or time on demurrage.~~

**Agents. See Clause 58.** 28.—~~Owners*/Charterers* are to appoint agents at loading port(s) and Owners*/Charterers* are to appoint agents at discharging port(s). In all instances, agency fees shall be for Owners' account but are not to exceed customary applicable fees.~~

**Strikes, Stoppages, etc.** 29.—If the cargo cannot be loaded by reason of Riots, Civil Commotions or of a Strike or Lock-out of any class of workmen essential to the loading of the cargo, or by reason of obstructions or stoppages beyond the control of the Charterers caused by Riots, Civil Commotions or a Strike or Lock-out on the Railways or in the Docks or other loading places, or if the cargo cannot be discharged by reason of Riots, Civil Commotions, or of a Strike or Lock-out of any class of workmen essential to the discharge, the time for loading or discharging, as the case may be, shall not count during the continuance of such causes, provided that a Strike or Lock-out of the Shippers' and/or Receivers' men shall not prevent demurrage accruing if by the use of reasonable diligence they could have obtained other suitable labour at rates current before the Strike or Lock-out. In case of any delay by reason of the before mentioned causes, no claim for damages or demurrage shall be made by the Charterers/Receivers of the cargo or Owners of the vessel. For the purpose, however, of settling despatch rebate accounts, any time lost by the vessel through any of the above causes shall be counted as time used in loading, or discharging, as the case may be.

**Ice.** 30.—~~Loading Port~~

(a) ~~If the Vessel cannot reach the loading port by reason of ice when she is ready to proceed from her last port, or at any time during the voyage, or on her arrival, or if frost sets in after her arrival, the Master—for fear of the Vessel being frozen in—is at liberty to leave without cargo; in such cases this Charter-party shall be null and void.~~

(b) ~~If during loading, the Master, for fear of Vessel being frozen in, deems it advisable to leave, he has liberty to do so with what cargo he has on board and to proceed to any other port with option of completing cargo for Owners' own account to any port or ports including the port of discharge. Any part cargo thus loaded under this Charterparty to be forwarded to destination at Vessel's expense against payment of the agreed freight, provided that no extra expenses be thereby caused to the Consignees, freight being paid on quantity delivered (in proportion if lump sum), all other conditions as per Charterparty.~~

(c) ~~In case of more than one loading port, and if one or more of the ports are closed by ice, the Master or Owners to be at liberty either to load the part cargo at the open port and fill up elsewhere for the Owners' own account as under sub-clause (b) or to declare the Charterparty null and void unless the Charterers agree to load full cargo at the open port.~~

~~Voyage and Discharging Port~~

(d) ~~Should ice prevent the Vessel from reaching the port of discharge, the Charterers/Receivers* shall have the option of keeping the Vessel waiting until the re-opening of navigation and paying demurrage or of ordering the vessel to a safe and immediately accessible port where she can safely discharge without risk of detention by ice. Such orders to be given within 48 hours after the Owners or Master have given notice to the Charterers/Receivers* of impossibility of reaching port of destination.~~

(e) ~~If during discharging, the Master, for fear of Vessel being frozen in, deems it advisable to leave, he has liberty to do so with what cargo he has on board and to proceed to the nearest safe and accessible port. Such port to be nominated by Charterers/Receivers* as soon as possible, but not later than 24 running hours, Sundays and holidays excluded, of receipt of Owners' request for nomination of a substitute discharging port, failing which the Master will himself choose such port.~~

(f) ~~On delivery of the cargo at such port, all conditions of the Bill of Lading shall apply and the Owners shall receive the same freight as if the Vessel had discharged at the original port of destination, except that if the distance to the substitute port exceeds 100 nautical miles the freight on the cargo delivered at that port to be increased in proportion.~~

(g) ~~Spring—This Ice Clause (a) to (f) not to apply in the Spring.~~

**Extra Insurance.** 31.—Any extra insurance on cargo incurred owing to vessel's age, ~~class~~, flag or ownership to be for ~~Owners' account up to a maximum of~~ Charterers' account. ~~and may be deducted from the freight, in Charterers' option. The Charterers shall furnish evidence of payment supporting such deduction.~~

**P. & I. Bunker Clause.** 32.—The vessel shall have the liberty as part of the contract voyage to proceed to any port or ports at which bunker oil is available for the purpose of bunkering at any stage of the voyage whatsoever and whether such ports are on or off the direct and/or customary route or routes between any of the ports of loading or discharge named in this Charterparty and may there take oil bunkers in any quantity in the discretion of Owners even to the full capacity of fuel tanks and deep tanks and any other compartment in which oil can be carried whether such amount is or is not required for the chartered voyage.

**Deviation.** 33.—Any deviation in saving or attempting to save life or property at sea or any reasonable deviation shall not be deemed to be an infringement or breach of this Charterparty and the owner shall not be liable for any loss or damage resulting therefrom; provided, however, that if the deviation is for the purpose of loading or unloading cargo or passengers it shall, *prima facie*, be regarded as unreasonable.

**Lien and Cesser Clause.** 34.—The Owners shall have a lien on the cargo for freight, ~~deadfreight~~, demurrage, and average contribution due to them under this Charterparty. Charterers' liability under this Charterparty is to cease on cargo being shipped except for payment of freight, ~~deadfreight~~, and demurrage ~~at loading~~, and except for all other matters provided for in this Charterparty where the Charterers' responsibility is specified.

**Exceptions.** 35.—Owners shall be bound before and at the beginning of the voyage to exercise due diligence to make the ship seaworthy and to have her properly manned, equipped and supplied and neither the vessel nor the Master or Owners shall be or shall be held liable for any loss of or damage or delay to the cargo for causes excepted by the ~~U.S. Carriage of Goods by Sea Act, 1936 or the Canadian Water Carriage of Goods Act, 1936.~~ **International Convention for the Unification of Certain Rules relating to Bills of Lading, dated Brussels 25th August 1924, the Hague Rules, or those rules as amended by the protocol signed at Brussels, February 23rd, 1968, the Hague-Visby Rules.** (if any)

And neither the vessel, her Master or Owners, nor the Charterers or Receivers shall, unless otherwise in this Charterparty expressly provided, be responsible for loss of or damage or delay to or failure to supply, load, discharge or deliver the cargo arising or resulting from:—Act of God, act of war, act of public enemies, pirates or assailing thieves; arrest or restraint of princes, rulers or people; seizure under legal process, provided bond is promptly furnished to release the vessel or cargo; floods; fires; blockades; riots; insurrections; Civil Commotions; earthquakes; explosions. No exception afforded the Charterers or Receivers under this clause shall relieve the Charterers or Receivers of or diminish their obligations for payment of any sums due to the Owners under provisions of this Charterparty.

**If the cargo is the property of the Charterers, the Owners shall have the same responsibility as they would have under this Clause had the cargo been the property of a third party and carried under a Bill of Lading incorporating the Hague Rules.**

* Delete as appropriate.



**General Clause Paramount.** —If the vessel loads in other than U.S. or Canadian ports the General Clause Paramount shall be incorporated in all Bills of Lading and shall read as follows:

"This Bill of Lading shall have effect subject to the provisions of any legislation incorporating the Rules contained in the International Convention for the Unification of certain rules relating to Bills of Lading dated Brussels, 25th August, 1924 (The Hague Rules) or those rules as amended by the protocol signed at Brussels, February 23rd, 1968 (The Hague-Visby Rules) and which is compulsorily applicable to the contract of carriage contained herein. If no such legislation is compulsorily applicable, the Hague Rules or, if applicable, the Hague-Visby Rules as enacted in the country of the port of loading shall apply. When no such enactment is in force in the country of the port of loading, the corresponding legislation of the country of the port of discharge shall apply and in the absence of any such legislation, the terms of the 1924 convention as amended by the 1968 protocol shall apply."

**U.S.A. Clause Paramount.** 36.—~~If the vessel loads in the U.S.A. the U.S.A. Clause Paramount shall be incorporated in all Bills of Lading and shall read as follows:~~
~~"This Bill of Lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April 16, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act. If any term of this Bill of Lading be repugnant to said Act to any extent, such terms shall be void to that extent, but no further."~~

**Canadian Clause Paramount.** 37.—~~If the vessel loads in Canada the Canadian Clause Paramount shall be incorporated in all Bills of Lading and shall read as follows:~~
~~"This Bill of Lading, so far as it relates to the carriage of goods by water, shall have effect, subject to the provisions of the Water Carriage of Goods Act 1936, enacted by the Parliament of the Dominion of Canada, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of any of its rights or immunities, or an increase of any of its responsibilities or liabilities under the said Act. If any term of this Bill of Lading be repugnant to said Act to any extent, such terms shall be void to that extent, but no further."~~

**Both-to-Blame Collision Clause.** 38.—If the liability for any collision in which the vessel is involved while performing this Charterparty falls to be determined in accordance with the laws of the United States of America, the following clause shall apply:

"If the vessel comes into collision with another vessel as a result of the negligence of the other vessel and any act, neglect or default of the master, mariner, pilot or the servants of the Carrier in the navigation or in the management of the vessel, the owners of the goods carried hereunder will indemnify the Carrier against all loss or liability to the other or non-carrying vessel or her Owners in so far as such loss or liability represents loss of or damage to or any claim whatsoever of the owners of the said goods, paid or payable by the other or non-carrying vessel or her owners to the owners of the said goods and set off, recouped or recovered by the other or non-carrying vessel or her owners as part of their claim against the carrying vessel or carrier.

The foregoing provisions shall also apply where the Owners, operators or those in charge of any vessel or vessels or objects other than, or in addition to, the colliding vessels or objects are at fault in respect to a collision or contact."

The Charterers shall procure that all Bills of Lading issued under this Charterparty shall contain the same clause.

**General Average/ New Jason.** 39.—General Average shall be payable according to the York/Antwerp Rules 1974 [as amended 1990 and 1994, and any subsequent amendment] and shall be settled in London.............................. Where the adjustment is made in accordance with the law and practice of the United States of America, the following clause shall apply: [adjusted and]

"In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequences of which, the carrier is not responsible, by Statute, contract or otherwise, the goods, shippers, consignees or owners of the goods shall contribute with the carrier in general average to the payment of any sacrifices, losses or expenses of a general average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the goods.

"If a salving vessel is owned or operated by the carrier, salvage shall be paid for as fully as if the said salving vessel or vessels belonged to strangers. Such deposit as the carrier or his agents may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required, be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery."

The Charterers shall procure that all Bills of Lading issued under this Charterparty shall contain the same clause.

**War Risks** **BIMCO Voywar 93 Clause** 40.—~~1. No Bills of Lading to be signed for any blockaded port and if the port of discharge be declared blockaded after Bills of Lading have been signed, or if the port to which the vessel has been ordered to discharge, either on signing Bills of Lading or thereafter, be one to which the vessel is or shall be prohibited from going by the Government of the Nation under whose flag the vessel sails or by any other Government, the owner shall discharge the cargo at any other port covered by this Charterparty as ordered by the Charterers, (provided such other port is not a blockaded or prohibited port as above mentioned) and shall be entitled to freight as if the vessel had discharged at the port or ports of discharge to which she was originally ordered.~~
~~2. The vessel shall have liberty to comply with any orders or directions as to departure, arrival, routes, ports of call, stoppages, destination, delivery or otherwise howsoever given by the Government of the Nation under whose flag the vessel sails or any department thereof, or by any other Government or any department thereof, or any person acting or purporting to act with the authority of such Government, or of any department thereof, or by any committee or person having, under the terms of the War Risks Insurance on the vessel, the right to give such orders or directions and if by reason of and in compliance with any such orders or directions anything is done or is not done, the same shall not be deemed a deviation, and delivery in accordance with such orders or directions shall be a fulfilment of the contract voyage and the freight shall be payable accordingly.~~

**Address Commission.** 41.—~~An address commission of ..............................% on gross freight, deadfreight and demurrage is due to Charterers at time freight and/or demurrage is paid, vessel lost or not lost, Charterers having the right to deduct such commission from payment of freight and/or demurrage.~~

**Brokerage Commission.** 42.—A brokerage commission of ......as agreed......% on gross freight, deadfreight, and demurrage is payable by Owners to......as agreed..............................
..............................
at time of receiving freight payment and/or demurrage payment(s), vessel lost or not lost.

**Assignment** 43.—Charterers have the privilege of transferring/assigning/reletting all or part of this Charterparty to others (guaranteeing to the Owners the due fulfillment of this Charterparty).

**Arbitration:** 44.—(a) ~~New York: All disputes arising out of this contract shall be arbitrated at New York in the following manner, and be subject to U.S. Law:~~
~~One Arbitrator is to be appointed by each of the parties hereto and a third by the two so chosen. Their decision or that of any two of them shall be final, and for the purpose of enforcing any award, this agreement may be made a rule of the court. The Arbitrators shall be commercial men. Such Arbitration is to be conducted in accordance with the rules of the Society of Maritime Arbitrators, Inc.~~
~~For disputes where the total amount claimed by either party does not exceed U.S. $3,500.00, or amount as mutually agreed, the Arbitration may be conducted in accordance with the Simplified Arbitration Procedure of the Society of Maritime Arbitrators Inc. if so desired by both parties.~~

*Delete para. (a) or (b) as appropriate.*

(b) London. ~~All disputes arising out of this contract shall be arbitrated at London and, unless the parties agree forthwith on a single Arbitrator, be referred to the final arbitrament of two Arbitrators carrying on business in London who shall be Members of the Baltic Mercantile & Shipping Exchange and engaged in the Shipping and/or Grain Trades, one to be appointed by each of the parties, with power to such Arbitrators to appoint an Umpire. No award shall be questioned or invalidated on the ground that any of the Arbitrators is not qualified as above, unless objection to his action be taken before the award is made. Any dispute arising under this Charter party shall be governed by English Law.~~

* Delete as appropriate.

All disputes from time to time arising out of the contract shall, unless the parties agree forthwith on a single Arbitrator, be referred to the final arbitrament of two Arbitrators carrying on business in London, who shall be engaged in the shipping trade and be LMAA member, one to be appointed by each of the parties, with power to such Arbitrators to appoint a third Arbitrator. Any Charter Party dispute must be made in writing and the Arbitrator must be appointed within twelve months after final discharge, and where this provision is not complied with, the dispute shall be extinguished and cease to exist. No award shall be questioned or invalidated on the grounds that any of the Arbitrators is not qualified as above, unless objection to his acting be taken before the award is made. The Charter Party to be construed in accordance with English Law and LMAA rules to apply. The Charterers shall be discharged and released from all liability in respect of any claim or claims which Owners may have under this Charter Party and such claim shall be totally extinguished, unless such claims have been notified in detail to Charterers in writing accompanied by all available supporting documents (whether relating to liability or quantum or both), within twelve months from completion of discharge of the appropriate cargo under this Charter Party.

**Additional Clauses Nos. 45 through 66 inclusive, as well as the ACTI Vessel Voyage Description Page and Owners' fully completed response to Charterers' Questionnaire, as attached, are all deemed to be fully incorporated in and form an integral part of this Charter Party.**

**THE OWNERS** **THE CHARTERERS**

**57.–Insurances.**
Owners warrant that the vessel is entered and will remain fully covered for the duration of this Charter Party (for both Head Owners and Disponent Owners responsibility / liabilities) by first class P & I Club/s including liability for oil pollution and first class Hull and Machinery insurers. Owners further warrant that all vessel's certificates required by national / international law are valid and will remain valid for the duration of this Charter Party.

**58.–Agents.**
Owners to appoint vessel's agents at loading and as nominated by Charterers at discharging port, for vessel's usual port matters including signing Bills of Lading. Such Agents to remain the servants of the Owners, who are to pay customary Agency fees. Owners have the right to appoint protecting agents.

**59.–Cargo Quantity.**
It is understood that Owners / Master cannot call for a quantity of cargo in excess of that permitted under Charter Party terms nor in excess of the quantity that vessel is able to lift in compliance with any loading and / or discharging draft restrictions and / or any other Charter Party limitations.

Agents are as follows:

<u>Altamira</u>
Lic Armando Reyna Alanis
Director
Agencia Consignataria Del Golfo S.A. de C.V.
" Golmar " Tampico/Altamira
telephone : 833- 2192988, 2122889, 2124824
fax : 833- 2123119
mobile phone: 833-2184665
e-mail : areyna@acgolmar.com.mx

833 2600 215
golmar.alt@acgolmar.com.mx

<u>Progreso</u>
Report Progreso, S.A. de C.V.
Calle 25 no.156 x 84 Centro
Progreso, Yucatan.
tax i.d. - rpr-941114-fga
c.p. 97320
tel./fax 969 9350305 / 969 93 51090
e-mail: report@multired.net.mx
contact: C. César E. Tuyin Méndez-operations móbil 999 9580507

<u>Vitoria</u>
Wilson Sons - Shipping
Av. Princesa Isabel nº 599 - 9º andar
Centro - Vitoria
CEP - 29010-361
Tel - 55-27-3232-1422
Fax - 55-27-3222-1297
Website - www.wilsonsons.com.br

**60.–Eligibility.**
Owners warrant that the vessel is in all respects eligible for trading to the ports, places and / or countries specified in this Charter Party.

**61.--Confidential Fixture.**
This fixture to be kept strictly private and confidential by all parties and not to be reported to anybody.

**62.--Laydays / Cancelling.**
Laytime for loading, if required by Charterers, not to commence before 08:00 hours on the 15th April, 2004 for 40.000 mts to Altamira, on the 15th May, 2004 respectively 15th June, 2004, for the May and June cargoes in Charterers' option 30.000 mts x 2 to Progreso or Altamira, or 40.000 mts x 2 to Altamira, or 30.000 mts to Progreso and 40.000 mts to Altamira.
Should the vessel's Notice of Readiness not be tendered and accepted as per Clause 17 before 24:00 hours on the 30th April, 2004, on the 31st May, 2004 respectively on the 30th June, 2004, the Charterers or their agents shall at any time thereafter, but not later than one hour after the Notice of Readiness is tendered, have the option of cancelling this Charter Party. When it becomes known to the Owners, that vessel's arrival will not be prior cancelling date as stated before, the Owners will advise the Charterers of her ETA load port together with a new cancelling date and Charterers to confirm within 48 hours whether or not they cancel this shipment or accept the new date of cancellation.

Each next destination/cargo size to be declared by Charterers latest upon arrival at Tubarao/Tubarao anchorage of the ship performing preceding shipment.

Owners to nominate final performer with 7 days prior to load port.

**63.--Freight Payment.**
Owners' banking details are as follows:

Vereins- und Westbank AG
Alter Wall 22, 20457 Hamburg
USD Account: 910 04 40 56
Swift Code: VUWBDEHH
Beneficiary: HBC Hamburg Bulk Carriers GmbH & Co. KG
Ref.: MV "HBC-TBN" / PROTEINOL – C/P 18.03.2004

**64.--Vessel's Description.**
MV "TBN"
- geared single deck bulk carrier
- maximum 25 years
- classed highest Lloyd's or equivalent
- fully ism certified
- fully P & I covered
- minimum 10 ts gear

**65.--Notices.**
Master/Owners to tender 7/5 days approximate notice and 3/1 days definite notice for load port and for discharge port Master/Owners to tender departure notice, 14/10/7/5 days approximate notice and 3/1 days definite notice.

The Charterers are to be kept continuously advised by telegram/telex of any alteration in vessel's readiness to load date.

66.--Inspection.

At the loading port, Master's Notice of Readiness shall be accompanied by pass of the National and regulatory body and surveyor's certificate of vessel's readiness in all compartments to be loaded, for the entire cargo covered by this Charter Party as per Clause 3. In any case time until inspection commenced to count as laytime if vessel tendered Notice of Readiness in accordance with all other terms of this Charter Party. Should vessel fail to be accepted time from failing survey until acceptance of cargo holds not to count.

* * * * * * * * *

## THE BALTIC AND INTERNATIONAL MARITIME CONFERENCE STANDARD WAR RISKS CLAUSE FOR VOYAGE CHARTERS, 1993 (CODENAME VOYWAR 1993)

(1) For the purpose of this Clause, the words:

(a) „Owners" shall include the Shipowners, Bareboat Charterers, Disponent Owners, Managers or other operators who are charged with the management of the vessel, and the Master, and

(b) „War Risks" shall include any war (whether actual or threatened), act of war, civil war, hostilities, revolution, rebellion, civil commotion, warlike operations, the laying of mines (whether actual or reported), acts of piracy, acts of terrorists, acts of hostility or malicious damage, blockades (whether imposed against all vessels or imposed selectively against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever), by any person, body terrorist or political group, or the Government of any state whatsoever, which, in the reasonable judgement of the Master and / or the Owners, may be dangerous or are likely to be or to become dangerous to the vessel, her cargo, crew or other persons on board the vessel.

(2) If at any time before the vessel commences loading, it appears that, in the reasonable judgement of the Master and / or the Owners, performance of the contract of carriage, or any part of it, may expose, or is likely to expose, the vessel, her cargo, crew or other persons on board the vessel to war risks, the Owners may give notice to the Charterers cancelling this contract of carriage, or may refuse to perform such part of it as may expose, or may be likely to expose, the vessel, her cargo, crew or other persons on board the vessel to war risks, provided always that if this contract of carriage provides that loading or discharging is to take place within a range of ports and at the port or ports nominated by the Charterers, the vessel, her cargo, crew, or other persons onboard the vessel may be exposed, or may be likely to be exposed, to war risks, the Owners shall first require the Charterers to nominate any other safe port which lies within the range for loading or discharging, and may only cancel this contract of carriage if the Charterers shall not have nominated such safe port or ports within 48 hours of receipt of notice of such requirement.

(3) The Owners shall not be required to continue to load cargo for any voyage, or to sign Bills of Lading for any port or place, or to proceed or continue on any voyage, or on any part thereof, or to proceed through any canal or waterway, or to proceed to or remain at any port or place whatsoever, where it appears, either after the loading of the cargo commences, or at any stage of the voyage thereafter before the discharge of the cargo is completed, that, in the reasonable judgement of the Master and / or the Owners, the vessel, her cargo (or any part thereof), crew or other persons on board the vessel (or any one or more of them) may be, or are likely to be, exposed to war risks. If it should so appear, the Owners may by notice request the Charterers to nominate a safe port for the discharge of the cargo or any part thereof, and if within 48 hours of the receipt of such notice, the Charterers shall not have nominated such a port, the Owners may discharge the cargo at any safe port of their choice (including the port of loading) in complete fulfilment of the contract of carriage.

The Owners shall be entitled to recover from the Charterers the extra expenses of such discharge and, if the discharge takes place at any port other than the loading port, to receive the full freight as though the cargo had been carried to the discharging port and if the extra distance exceeds 100 miles, to additional freight which shall be the same percentage of the freight contracted for as the percentage which the extra distance represents to the distance of the normal and customary route, the Owners having a lien on the cargo for such expenses and freight.

(4) If at any stage of the voyage after the loading of the cargo commences, it appears that, in the reasonable judgement of the Master and / or the Owners, the vessel, her cargo, crew or other persons on board the vessel may be, or are likely to be, exposed to war risks on any part of the route (including any canal or waterway) which is normally and customarily used in a voyage of the nature contracted for, and there is another longer route to the discharging port, the Owners shall give notice to the Charterers that this route will be taken. In this event the Owners shall be entitled, if the total extra distance exceeds 100 miles, to additional freight which shall be the same percentage of the freight contracted for as the percentage which the extra distance represents to the distance normal and customary route.

(5) The Vessel shall have liberty:-

(a) to comply with all orders, directions, recommendations or advice as to departure, arrival, routes, sailing in convoy, ports of call, stoppages, destinations, discharge of cargo, delivery, or in any other way whatsoever, which are given by the government of the nation under whose flag vessel sails, or other government to whose laws the Owners are subject, or any other government, which so requires, or any body or group acting with the power to compel compliance with their order or directions;

(b) to comply with the orders, directions or recommendations of any war risks underwriters who have the authority to give the same under the terms of the war risk insurance;

(c) to comply with the terms of any resolution of the Security Council of the United Nations, any directives of the European Community, the effective orders of any other supranational body which has the right to issue and give the same, and with national laws aimed at enforcing the same to which the Owners are subject, and to obey the orders and directions of those who are charged with their enforcement;

(d) to discharge at any other port any cargo or part thereof which may render the vessel liable to confiscation as a contraband carrier;

(e) to call at any other port to change the crew or any part thereof or other persons on board the vessel when there is reason to believe that they may be subject to internment, imprisonment or other sanctions.

(f) where cargo has not been loaded or has been discharged by the Owners under any provisions of this Clause, to load other cargo for the Owners' own benefit and carry it to any other port or ports whatsoever, whether backwards or forwards or in a contrary direction to the ordinary or customary route.

(6) If the compliance with any of the provisions of sub-clauses (2) to (5) of this Clause anything is done or not done, such shall not be deemed to be a deviation, but shall be considered as due fulfilment of the contract of carriage.

H. VOGEMANN
GmbH
HAMBURG

ADDITIONAL CLAUSES TO THE CHARTER PARTY M/V "HBC – TBN"

DATED HAMBURG, 18TH MARCH, 2004

**45.–Warping.**
The Master and crew to collaborate in all quay / pier movements necessary to accommodate shore loading / discharging equipment in the respective holds / spaces. Warping, if required to facilitate loading / discharging operations, to be for Owners' account, however, tug assistance, pilots, linesmen, if required, to be for Charterers' account, and laytime used in warping to count.

**46.–Bunkering Operations.**
The vessel is allowed to bunker during loading / discharging operations, provided port terminal authorities permit and provided Owners guarantee that bunkering will not interfere with loading / discharging operations and all damages done to the cargo by bunkering to be paid by Owners.

47.–Statements of Facts at loading and discharging port/s to be signed by the Agents of the Ship and by the Master.

**48.–Sailing Notice.**
A sailing telegram is to be sent by the Master to Charterers, on vessel's leaving loading port, giving ship's name, call letters, sailing date and port, exact quantity of cargo loaded and ETA off the discharging range.

**49.–Fumigation.**
Vessel's holds to be fumigated at Charterers' time, risk and expense and time at load port to count upon completion of loading and holds will be closed and sealed. Fumigation exposure to be during the vessel's transit time to discharge port. Upon arrival at discharge port, ventilation time, if any, to be for Charterers' time, and time for discharge to count.

**50.–Grab-Discharge etc.**
The vessel is guaranteed suitable for grab-discharge. Charterers have the option of using tractors in vessel's holds, provided unit weight of such devices is in accordance with vessel's tanktop strength.

**51.–BIMCO Bulk Shipping Quality Clause.**
The Owner and the Charterer hereby agree that they shall make safety and quality considerations an integral part of their chartering activities. In particular, the Owners shall exercise due diligence:

(a) before and at the beginning of the voyage to make the vessel seaworthy and in every way fit for the voyage and for the trade for which she is to be employed;

(b) throughout the currency of this Charter Party to ensure that the vessel and her Master, officers and crew comply with safety, health and other applicable laws and regulations of the vessel's flag state and of the places where she trades necessary to secure the safe and unhindered loading of the cargo, performance of the voyage and discharge of the cargo.

Furthermore, the vessel shall be:

(c) fully insured in respect of loss or damage to cargo by Protection and Indemnity Club or liability underwriter and the Owners shall provide, on request, evidence of such insurance,

(d) insured for Hull and Machinery and basic war risks purposes,

(e) classed and the Owners warrant that this class shall be maintained throughout the currency of this Charter Party.

The provisions of this Clause shall be without prejudice to the other rights, obligations and defences of the Owners under this Charter Party including, where applicable, those of the Hague- or Hague-Visby Rules.

**52.-- (a) Time Counting at the Loading Port.**
At the loading port, laytime in accordance with the provisions of Clause 18 paragraph (b) shall not count from Saturdays or from 1700 hours, on days prior a holiday, until Monday at 8 AM, or 8 AM on next working day, unless used.

**53.--Taxes and Dues.**

At loading and discharging port(s), any taxes and / or dues on cargo to be for Charterers' / Receivers' account and any taxes and / or dues on vessel and / or freight and / or flag to be for Owners' account. Vessel's normal and customary port charges at load and discharge port(s) to be for Owners' account, irrespective of the method of calculation.

**54.--BIMCO ISM Clause.**
During the currency of this Charter Party the Owners shall procure that both the vessel and „the company" (as defined by the ISM Code) shall comply with the requirements of the ISM Code. Upon request the Owners shall provide a copy of the relevant Document of Compliance (DOC) and Safety Management Certificate (SMC) to the Charterers. Except as otherwise provided in this Charter Party, loss, damage, expense and / or delay caused by the failure on the part of the Owners of „the company" to comply with the ISM Code shall be for Owners' account.

**55.--Boycott.**
Any boycott due to performing vessel's flag / ex-flag and / or class and / or ownership / ex-ownership to be at Owners' time, risk and expense.

**56.--Bills of Lading.**

(a) Clean Mate's Receipts to be signed for each parcel of cargo when on board, and Master to sign Bill/s of Lading in accordance therewith as requested by Charterers / Shippers or their agents. Master to reject any cargo that would involve the clausing of Mate's Receipts and / or Bills of Lading. Any time lost / expenses involved due to Master's rejection to be for Charterers' account provided that Master has validly rejected said cargo.

(b) Charterers' option to issue Bill/s of Lading marked „Freight payable as per Charter Party", in which case Owners to authorise release of Bill/s of Lading upon receipt of Charterers' Bank's written confirmation the 100 % freight as per Clause 9 (b) has been irrevocably transferred to Owners' Bank.

(c) Owners to release Bills of Lading for cargo shipped on board for such quantity as may be required by Charterers, prior to vessel's completion of loading, against payment by Charterers of the corresponding freight.

ADDENDUM N° 1

TO THE CHARTER PARTY M/V HBC-TBN DATED HAMBURG, 18TH MARCH, 2004

IT HAS BEEN MUTUALLY AGREED,

between HBC Hamburg Bulk Carriers GmbH & Co. KG, Hamburg/Germany (Disponent Owners),

and Proteinas Y Oleicos S.A. de C.V. Merida, Yucatan/Mexico (Charterers),

it is mutually agreed that:

- extension of present Charter Party for 2 further voyages as follows:
  4th voyage – laycan July 1st – 15th
  5th voyage – laycan July 16th – 31st

- and in Charterers' option to be declared latest closing of business Mexico City April 19th:
  6th voyage – laycan August 1st – 15th

- same terms and conditions as per present fixture, except decrease of freights as follows:
  USD 41,--/mt for 40.000 mts cargo
  USD 43,--/mt for 30.000 mts cargo

All other terms and condition of this Charter Party to remain unaltered.

Hamburg, 6th April, 2004

THE OWNERS THE CHARTERERS

# ADDENDUM N° 2

## TO THE CHARTER PARTY M/V HBC-TBN DATED HAMBURG, 18TH MARCH, 2004

IT HAS BEEN MUTUALLY AGREED,

between HBC Hamburg Bulk Carriers GmbH & Co. KG, Hamburg/Germany (Disponent Owners),

and Proteinas Y Oleicos S.A. de C.V. Merida, Yucatan/Mexico (Charterers),

it is mutually agreed that:

- as from nomination no. 2 onwards 100pct freight less undisputed despatch or plus undisputed demurrage at loadport and any balances - provided due - from previous voyages, whatever applicable, shall be paid latest two banking days prior arrival of discharge port.
- in order to assist Charterers in their logistics, Owners agree to change agreed shipment dates from 1st-15th July, 2004 to 1st-15th August, 2004.
  Schedule then (sofar): 15th-30th June, 2004, 16th-31st July, 2004, 1st-15th August, 2004

All other terms and condition of this Charter Party to remain unaltered.

Hamburg, 21st May, 2004

THE OWNERS THE CHARTERERS

# ADDENDUM N° 3

TO THE CHARTER PARTY M/V HBC-TBN DATED HAMBURG, 18TH MARCH, 2004

IT HAS BEEN MUTUALLY AGREED,

between HBC Hamburg Bulk Carriers GmbH & Co. KG, Hamburg/Germany (Disponent Owners),

and Proteinas Y Oleicos S.A. de C.V. Merida, Yucatan/Mexico (Charterers),

it is mutually agreed that:

1) Freight rates for voyages 4 and 5, to be reduced by USD 2,--/mt from the present rate, i.e. USD 41,--/mt for Progreso and Altamira on 30,000 mts, and USD 39,--/mt for 40,000 mts for Altamira. Demurrage rates to be changed to USD 28.000,-- per day pro rata for 30,000 mts, and USD 30.000,-- for 40,000 mts. The agreed demurrage/freight rates are non-renegotiable by Charterers.

2) Voyage 4, initial agreed laycan 1st – 15th July (amended to 1st – 15th August, 2004), to be performed with a laycan of 1st – 15th September, 2004, and voyage 5, initial agreed laycan 16th – 31st July, to be performed with a laycan of 15th – 30th September, 2004. Destination and quantity of voyage 4 to be declared by Charterers latest on 6th August, 2004. Destination and quantity of voyage 5 to be declared by Charterers latest on 20th August, 2004.

3) Proteinol will have HBC's participation in all her ocean freight requirements for the balance of 2004.

4) Proteinol will also have HBC's participation for the 2005 CoA tender, which will have verification for mid November/early December, 2004; involving 2 voyages per month from January to December, 2005 ex US Gulf to East Coast Mexico with bulk soybeans.

5) Proteinol will also request HBC's participation for the soybeans imports ex Tubarao for 2005, when this is ready to be performed.

6) Proteinol confirm to credit HBC's account with the outstanding balance amounting to USD 154.690,28 latest on Monday the 19th July, 2004.

All other terms and condition of this Charter Party to remain unaltered.

Hamburg, 14th July, 2004

THE OWNERS

Owners' signature:
Name and title (in block letters):
Stamp:

THE CHARTERERS

Charterers' signature:
Name and title(in block letters):
Stamp: