HEALY & BAILLIE, LLP
Attorneys for Defendant
Proteinas Y Oleicos S.A. De C.V.
Jeremy J. O. Harwood (JH 9812)
Jack A. Greenbaum (JG 0039)
Jana N. Byron (JB 6725)
61 Broadway
New York, NY 10006-2701
Tel.: (212) 943-3980
Fax: (212) 425-0131

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

HBC HAMBURG BULK CARRIERS GMBH
& CO. KG,

        Plaintiffs,

-against-

PROTEINAS Y OLEICOS S.A. DE C.V.,

        Defendants.

---

04 CV 6884 (NRB)
***ECF CASE***

**DEFENDANT'S MEMORANDUM OF LAW IN REPLY TO PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO VACATE MARITIME ATTACHMENTS, BAR FURTHER ATTACHMENTS, AND DISMISS THE ACTION**

This memorandum is submitted on behalf of Defendant, Proteinas Y Oleicos S. A. de C. V. ("Proteinas"), in reply to the memorandum submitted by Plaintiff, HBC Hamburg Bulk Carriers GMBH & CO. KG ("HBC"), in opposition to Proteinas' motion to vacate the attachments herein. There is no need to reply to HBC's recitation about the fundamentals of maritime attachment and arbitration about which Proteinas raised no issue in its motion, or the merits of HBC's exaggerated claims, which are for English arbitrators to decide.

After Proteinas filed this motion, Citibank froze two additional Electronic Fund Transfers ("EFT") of USD501,551.26 and USD333,414.53 originated by Unilever de Mexico S. de R. L. ("Unilever") for transmission to Proteinas's bank in Merida, Mexico, BBV Bancomer Mexico ("Bancomer"), via JP Morgan Chase Bank. (Cabrera Reply Decl.; Greenbaum Reply Decl. Ex. 1) As with the other Citibank EFTs discussed in Proteinas' prior memorandum, Citibank was the originator's bank, or the correspondent of the originator's foreign bank. Citibank was not a correspondent of either of Proteinas' banks and Proteinas has no account there. Additionally, these seizures took place after Proteinas filed its notice of general appearance. Therefore, the points in Proteinas' prior memorandum about such facts apply to the Unilever EFTs.

HBC has requested that a decision about the EFTs frozen by Bank of America be deferred because HBC attached the same EFTs in an action it filed in South Carolina in response to Proteinas' contention that those EFTs were wrongly frozen outside New York. We trust HBC means only to request the Court defer a decision on the issue of extraterritoriality. There is no reason to defer a decision whether such EFTs were Proteinas' property to begin with, and whether the attachment reached EFTs made after Proteinas' general appearance[1].

---

[1] The only EFTs in relation to which a situs outside New York was the sole ground relied upon to vacate the seizure were: $100,000 from Scotiabank Inverlat S. A. to Proteinas representing a purchase of US dollars;

273617.1                                              1

Proteinas does not agree to stay its motion in relation to the EFTs frozen by Bank of America outside New York. On the contrary, Rule E.1 of the Local Admiralty and Maritime Rules of this Court ensures the constitutionality of maritime attachment by requiring a hearing within three days, unless otherwise ordered. Although Proteinas has not insisted on such a time limit, it has not waived its right to have its motion decided in a reasonable time.

POINT I

### MOST OF THE EFTS WERE NOT PROTEINAS' PROPERTY AND THEREFORE WERE IMPROPERLY SEIZED

HBC is not correct in suggesting Winter Storm Shipping, Ltd. v. TPI, 310 F. 3d 263 (2d Cir. 2002), held an EFT is attachable property <u>irrespective of who owns it</u>. The Second Circuit made a point of holding the EFT there belonged to the originator/defendant, and that is why it was attachable on a claim against the defendant. The Court wrote, at 276:

> Nor are we able to discern in admiralty law or elsewhere a basis for regarding TPI's [originator/defendant] funds in BNY's [intermediary bank] hands prior to their electronic transfer to RBS [beneficiary's bank in London] as anything other than <u>funds held by BNY for the account of TPI</u>.[2]

Thus, in the present case, the EFTs in the hands of Citibank, as the originators' bank or the originators' foreign bank's intermediary, cannot be regarded "as anything other than funds held by [Citibank] for the account of [the originators];" they are not funds held for the account of the intended beneficiary, Proteinas. The same is true of the Cargill EFTs frozen by Bank of America. This is especially clear in the case of the EFT that was to have been routed to

---

$7,500 originated by Proteinas for Healy & Baillie, LLP; and $8,170 originated by Proteinas for Duraloy Technologies Inc. (See Defendant's Memorandum in Support of Motion, at 5-6)

[2] Emphasis throughout this memorandum is added unless otherwise specified.

273617.1

2

Bancomer via JP Morgan Chase, not via Bank of America. (See Def. Mem. at 4-5) Notably, HBC's opposition does not and cannot deny that the Citibank and Cargill EFTs are identical in status to the EFT in Winter Storm, which was held to be the originator's property.

HBC suggests that in Winter Storm, the EFT was the property of the originator because it was in the hands of the originator's foreign bank's intermediary, not the beneficiary's foreign bank's intermediary. The same is true of all but one of the EFTs originated by third parties for transfer to Proteinas, so HBC should not contest that these EFTs are the originators' property.[3]

In fact, there was only one American bank in the chain in Winter Storm. It makes sense that the EFT was held to be the originator's property, as it was frozen before it was credited or paid to the beneficiary's foreign bank. Sections 4A-406 and 4A-209(2) of the Uniform Commercial Code provide payment to a beneficiary is not effected until the intermediary credits or pays the beneficiary's bank.

Similarly here, there was only one American bank in two of the Cargill EFTs. All three of the Cargill EFTs originated with its bank, Bank of America in Florida. One EFT was to have been routed to Proteinas' bank, Bancomer, through JP Morgan Chase Bank, so Bank of America inarguably held that EFT for Cargill's account. The other two Cargill EFTs were to be routed via Banco Bajio's correspondent, Bank of America in California. As in Winter Storm, there was only one American bank in the chain of those two EFTs; the EFTs were never credited to Banco Bajio's account in Bank of America[4]; and they remained the property of the originator, Cargill.

---

[3] The exception was USD53,682.21 initiated by Malta Texa de Mexico S. A. de C. V. through Citibank for transmission to Banco Bajio via Bank of America, which was frozen by Bank of America. (See Def. Mem. at 5.)

[4] Bank of America produced no documents pursuant to HBC's subpoena indicating the EFTs were credited to Banco Bajio's account. Plainly, they could not have been seized by Bank of America if they were in Banco Bajio's account. As stated in the Advisory Committee Notes to Rule E(4)(f): "The plaintiff has the burden of showing why the seizure should not be vacated."

273617.1                                              3

In <u>Ythan Limited v. Americas Bulk Transport Ltd.</u>, 2004 U. S. Dist. LEXIS 18570 at *9 (S.D.N.Y. 2004), the District Court also made a point of holding ownership of the EFT was <u>not</u> transferred away from the originator/defendant when the EFT was transferred out of the originator's bank and into the intermediary bank. HBC is mistaken in saying (Pl. Mem. at 21) that the originator of the after-acquired EFT in <u>Ythan Limited</u> was a third party.

As noted in Proteinas' prior memorandum, <u>Winter Storm</u> and <u>Ythan</u> are <u>consistent</u> with U.C.C. §§ 4A-406 and 209(2). Therefore, HBC errs in suggesting these sections <u>conflict</u> with Supplemental Rule B of the Federal Rules of Civil Procedure. A plaintiff can only attach property if the property belongs to the defendant. State law determines who owns property. Ownership of shore-side property is not an issue of maritime law.[5] It is as proper for State law to define the time when ownership of an EFT passes (<u>i.e.</u>, when payment of an obligation is effected), as to define, for example, when ownership passes on the sale of goods. It does not derogate from Rule B if a plaintiff cannot attach goods sold f.o.b. by a defendant when the goods are in a rail car because ownership passed to the buyer on loading the rail car.

<u>Winter Storm</u> does not hold that all of <u>U.C.C.</u> Article 4A is preempted. Its holding that Rule B preempts § 4A-503 was on the basis that the particular section would preclude the <u>use</u> of Rule B on EFTs merely because they were in the hands of an intermediary bank. That is a very different issue than determining who owns the property to begin with.

Only the Malta Texa EFT was in the hands of Bank of America in its capacity as the correspondent of one of Proteinas' Mexican banks. This EFT was never credited to Banco

---

[5] If, however, maritime law governs, that law is clearly enunciated in <u>Winter Storm</u>: an EFT in the hands of an intermediary bank is held for the account of the originator. It cannot simultaneously be the property of the beneficiary.

Bajio's account in Bank of America (see note 4, supra). Therefore, under U.C.C. §§ 4A-406 and 4A-209(2), Malta Texa did not effect payment to Proteinas, and, pursuant to Winter Storm, the EFT continued to be held by the intermediary bank for the account of Malta Texa.

Even if the EFT were credited to Banco Bajio's account in Bank of America, it would not constitute property of Proteinas situated in New York. Banco Bajio's account in Bank of America is Banco Bajio's property, not Proteinas' property. More accurately, that account constitutes a debt owing by Bank of America to Banco Bajio, or a credit for the account of Banco Bajio; it is not a debt or a credit owed by Bank of America to Proteinas. Obviously, Proteinas and Banco Bajio's other customers have no power to tell Bank of America to send them money from Banco Bajio's account. It is Banco Bajio itself who would hold a credit for the account of or owe a debt to Proteinas if its American account were credited. But Banco Bajio is not in New York and is not the garnishee. The same would apply to all the EFTs by third parties if credits were made to Banco Bajio's and Bancomer's accounts in the U. S.

HBC displays a willful ignorance of elemental banking law in characterizing as confusion, obfuscation, and contrary to common sense and accounting principles, the simple fact that a bank account is merely a debt of a bank to its depositor, and the debt itself (not any funds) is the depositor's property. Therefore, a U. S. intermediary bank holding a foreign bank's account merely owes a debt to the foreign bank. It owes no debt to and holds no property of the foreign bank's many customers. In the following quotations from a leading text on banking law, Henry Harfield, Bank Credits and Acceptances (5th Ed. 1974), the "depositor" or "customer" would be the foreign bank, the "bank" would be the American intermediary bank holding the foreign bank's account, and the "payee" would be the foreign beneficiary:

> . . . The depositor-banker relationship is that of creditor and debtor, in which the depositor is the lender and the bank the borrower.

273617.1                                    5

> Funds deposited are assets of the bank, which has no obligation to account to the depositor for its use of those funds. Its sole obligation is to repay to the depositor, or upon his order, on demand or at a specified future date, a like kind and amount of currency as that which was deposited. At 6.

> \*    \*    \*

> ... The customer, having negotiated for the purchase of a Holstein heifer, proposes to use a part of that credit balance and offers the vendor his check in payment of the purchase price. The check is a written command by the customer, addressed to the bank, directing the payment to the vendor or his order, and as between the customer and the bank, the bank's obligation to comply with that order is absolute. The bank will be liable to the customer for its wrongful failure to comply with the order. As a matter of law, however, the check does not operate as an assignment *pro tanto*, of the customer's credit balance with the bank; making and delivery of the check <u>has created no duty from the bank to the payee or holder</u>; and, therefore, if for any reason the bank declines to pay the amount of the check, the vendor, now the payee and holder of the check, must look to the customer for recourse. At 8.

The Court held in *Reichling v. Continental Bank*, 813 F. Supp. 197, 193 (E.D.N.Y. 1993):

> It is well-settled under New York law that the relationship between a bank and its depositor is the contractual relationship of debtor and creditor and the amount on deposit represents an indebtedness by the bank to the depositor. \*\*\* Furthermore, "the money deposited with the bank belongs to the bank and is not the property of the depositor. The property of the depositor is the indebtedness of the bank to it, a mere chose in action." 9 NY Jur. 2d, Banks, § 238. \*\*\*

In *Citizens Bank of Maryland v. Strumpf*, 516 US 16, 21, 133 L. Ed. 2d 258, 264 116 S. Ct. 286 (1995), the Supreme Court wrote:

> That view of things might be arguable if a bank account consisted of money belonging to the depositor and held by the bank. In fact, however, it consists of nothing more or less than a promise to pay, from the bank to the depositor [citations omitted].

HBC's argument that Proteinas' accountants book its customers' debts as accounts receivable evinces HBC's misunderstanding of what is being attached. Obviously the

customers' debts are receivables, but the customers are not in New York and are not garnishees.

HBC's argument that Proteinas' customers have not intervened to claim the funds is irrelevant. The customers would not be expected to assert they have not paid their debts or to hire lawyers to fight Proteinas' fight. The Advisory Committee Notes to the 1985 Amendment of Supplemental Rule E state: "Rule E(4)(f) is triggered <u>by the defendant</u> or any other person with an interest in the property seized." The facts underlying the EFTs in this case are not disputed. Ownership of the EFTs is a legal conclusion for the Court to decide, not the customers.

If the Court holds the EFTs are not Proteinas' property while in the hands of intermediaries of the originators' foreign banks and/or Proteinas' foreign banks, the Court should direct HBC to release such EFTs in South Carolina and not to attempt to seize such EFTs again anywhere in this country, as the issue of ownership will have become <u>res judicata</u>.

There is no unfairness if the credits in a foreign bank's account held by a U. S. bank cannot be attached because they belong to the foreign bank and not to the foreign bank's customer. HBC willingly did business with a Mexican company, as Proteinas willingly did business with a German company. It was to be expected that the parties' bank accounts were in their home countries. Both agreed to arbitrate any disputes in England. Neither has an intrinsic right to expect the United States to provide them a judicial forum. The fact that an EFT moving between two foreign countries passes through New York is fortuitous. The fortuitous nature of the EFT's situs may not prevent seizure if the grounds and ownership exist, but it also does not provide any reason to bend over backwards to permit seizure by distorting the fundamental law and statutes governing banking and EFTs.

We fail to understand the reason HBC cites *Maryland Tuna Corp. v. MS BENARES*, 429 F. 2d 307 (2d Cir. 1970). There, the plaintiff sought to attach a foreign corporation's alleged

273617.1                                  7

ownership interest in a New York corporation and debts allegedly due from the New York company to the foreign company. The case has nothing to do with the nature of ownership of property, or with banks or EFTs.

## POINT II

### THE SEIZURES BY BANK OF AMERICA WERE IMPROPER BECAUSE THE EFTS WERE NOT LOCATED IN NEW YORK

HBC has not contested that Process of Maritime Attachment issued in New York may not affect EFTs located outside New York, and has offered no evidence to refute Proteinas' evidence of the actual routing instructions it gave its customers and the customers gave their banks. HBC has not met its burden to prove facts showing why the attachments should not be vacated.

## POINT III

### PLAINTIFF SHOULD BE BARRED FROM SERVING FUTURE PROCESSES OF MARIITME ATTACHMENT AND FUNDS FROZEN AFTER PROTEINAS FILED ITS NOTICE OF GENERAL APPEARANCE SHOULD BE RELEASED

A General Appearance is a submission to the personal jurisdiction of the Court. The alternative would have been a Restricted Appearance under Supplemental Rule E(8). HBC tries to divert attention from Proteinas' submission to jurisdiction by focusing on Proteinas' counsel's telefax offering to accept service of the complaint. It is not that telefax which constitutes a submission to jurisdiction, but the fait accompli of a General Appearance.

HBC's long discussion about the dual purpose of maritime attachment, to acquire both jurisdiction and security, does not confront the basic law cited in Proteinas' memorandum that: "The two purposes may not be separated, however; security cannot be obtained except as an adjunct to obtaining personal jurisdiction." Seawind Compania, S. A. v. Crescent Line, Inc., 320 F. 2d 580, 582 (2d Cir. 1963) Having obtained personal jurisdiction, HBC may no longer obtain security in addition to that obtained prior to Proteinas' submission to jurisdiction.

273617.1                                    8

It is surprising HBC would rely on the argument made by Proteinas' counsel for a plaintiff in another case (and misconceives both the argument and the decision). It is the Court's ruling that counts, not counsel's argument. In Pioneer Trading (Asia Pacific), Ltd. v. Seyang Shipping Company, Ltd., 04 CV 5655 (S.D.N.Y. 2004) (Ex. 5 to Greenbaum Declaration dated Dec. 27, 2004), the Court rejected counsel's argument and held that filing a General Appearance forecloses future levies of process of maritime attachment.

HBC misconceives the holding in Pioneer in arguing (Pl. Mem. at 19) that Judge Batts did not rule or need to rule on whether a General Appearance defeats additional service of a maritime attachment "without evidence the defendant was otherwise subject to the court's *in personam* jurisdiction." Judge Batts made no finding whether or not the defendant actually was subject to personal jurisdiction, but upheld the first attachment on the grounds the plaintiff's counsel could not find the defendant here despite exercising due diligence. (Greenbaum Reply Decl. Ex. 2; a copy of the entire transcript was provided to HBC's counsel promptly after Proteinas' motion was filed.) In other words, Judge Batts did not find it necessary to determine whether or not there would have been personal jurisdiction because it made no difference to her holding that a General Appearance barred further attachments.

Plaintiff's argument in Pioneer was that all the cases barring the levy of attachments after a General Appearance were at least 20 years old, and the law should be considered to have evolved. Judge Batts obviously disagreed, and held those cases still to be good law.

The fact that the rule upheld by Judge Batts was firmly entrenched is underscored by HBC's attempt to distinguish Western Bulk Carriers (Australia) Pty. v. P. S. International, Ltd., 762 F. Supp. 1302 (S.D. Ohio 1991) on the basis the plaintiff did not oppose the argument that the defendant's appearance barred further attachments, and Maryland Shipbuilding &

Drydocking Co. v. Pacific Ruler Corp., 201 F. Supp. 858 (S.D.N.Y. 1962), in which a plaintiff discontinued an action after the defendant appeared, and wrongfully filed a second attachment action in the same District. The Western Bulk plaintiff did not oppose the argument, and the Maryland Shipbuilding plaintiff discontinued the first attachment action, because counsel knew it was the firm rule that the defendants' appearances precluded further attachments.

HBC misplaces its reliance on the cases cited at page 14 of its memorandum for the very reason HBC states in its analyses: the defendants' attempts to submit to jurisdiction of those cases were before the original attachment was served, and the plaintiffs were not permitted thus to defeat the plaintiffs' right of attachment. The cases cited at pages 14-16 of Proteinas' prior memorandum are clear that an appearance does preclude additional service of the attachment.

Clearly, the Court should bar HBC from levying any additional attachments in New York (which HBC might attempt to do if this Court vacates any of the attachments that are the subjects of this motion). Additionally, because security may not be obtained except as an adjunct to jurisdiction, and the Court now has personal jurisdiction over Proteinas, the EFTs seized after Proteinas' appearance should be released.

## CONCLUSION

**THE ATTACHMENTS SHOULD BE VACATED AND THE EFTS RELEASED, AND HBC SHOULD BE PRECLUDED FROM SERVING ANY FURTHER ATTACHMENTS**

Dated: New York, N. Y.
      January 25, 2005

Of Counsel:
Jeremy J. O. Harwood (JH 9812)
Jana N. Byron (JN 6725)

HEALY & BAILLIE, LLP
Attorneys for Defendant

by_____
Jack A. Greenbaum (JG0039)
61 Broadway
New York, N. Y. 10006
(212) 943-3980

273617.1                                         10