UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------x
                                         :
HBC HAMBURG BULK CARRIERS
GMBH & CO. KG,                                       :
                                                              **MEMORANDUM AND**
              Plaintiff,          :              **ORDER**

    - against -                   :              04 Civ. 6884 (NRB)

PROTEINAS Y OLEICOS S.A. DE C.V.,           :

              Defendant.          :
----------------------------------------x
**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

        On August 25, 2004, HBC Hamburg Bulk Carriers GMBH & Co. KG

("HBC" or "plaintiff"), applied <u>ex</u> <u>parte</u> for an order of

maritime attachment pursuant to Rule B of the Supplemental Rules

for Certain Admiralty and Maritime Claims ("Rule B").   HBC's

application was granted, and HBC obtained a Process of Maritime

Attachment and Garnishment ("PMAG") in the Southern District of

New York.   Pursuant to this PMAG, HBC subsequently attached a

number of electronic funds transfers ("EFTs") as property of the

defendant Proteinas y Oleicos S.A. de C.V. ("Proteinas" or

"defendant").   Proteinas now moves pursuant to Supplemental

Rule E(4)(f) to vacate the HBC's attachment of the EFTs.   For

the reasons set forth below, Proteinas' motion is granted in

part and denied in part.

## BACKGROUND[1]

On March 8, 2004, HBC, a German leasor of shipping vessels, and Proteinas, a Mexican corporation, entered into a maritime contract whereas HBC agreed to provide Proteinas vessels to transport soybeans from Brazil to Mexico.  A dispute arose among the parties, with HBC alleging that Proteinas owed it $1,590,408.11 for breach of their maritime contract.  Pursuant to their charter contract, the parties have submitted the underlying dispute to arbitration in London, England.

HBC filed a verified complaint on August 25, 2004 in the Southern District of New York with a request for the issuance of an attachment order under Rule B.  In its verified complaint, HBC alleged that Proteinas could not be found within the district, but that Proteinas had, or would shortly have, assets located in this district.  Based on these assertions, we ordered the Clerk of this Court to issue HBC a PMAG allowing for the attachment of Proteinas' property within this district, up to and including the amount in contest.  On August 26, 2004 and thereafter, HBC served the PMAG on Bank of America in New York. On September 21, 2004 and thereafter, HBC served the PMAG on

---

[1] The facts discussed below are drawn from plaintiff's and defendant's briefs to this court, as well as the accompanying exhibits, and are not in dispute.

Citibank in New York.  Proteinas filed a general appearance in this district on September 23, 2004.

Pursuant to the PMAG, both Citibank and Bank of America attached a number of EFTs as property of Proteinas.  These attachments included EFTs sent by third-parties to Proteinas as payments, and EFTs initiated after Proteinas filed its general appearance in this district.  Proteinas contends that a number of these attachments do not conform to the requirements of Rule B.

**The Attached Funds**

As part of its business, Proteinas requires its customers to pay for purchases in U.S. Dollars, deposited in Proteinas' accounts at either Banco Del Bajio, S. A. de C.V. ("Banco Bajio") or BBVA Bancomer Mexico ("Bancomer") in Mexico (collectively "Proteinas' Mexican Banks").  To make payment in U.S. Dollars at Protenias' Mexican Banks, many of Proteinas' customers must engage in complex but commonplace international funds transfers, primarily using EFTs to transfer funds through a number of different banks.  For the purposes of such transactions, both of Proteinas' Mexican banks maintain bank accounts with certain U.S. banks that act as intermediaries.  In essence, all transactions in U.S. Dollars associated with

Proteinas' Mexican Banks are routed throught two U.S. intermediaries: JP Morgan Chase Bank in New York ("JP Morgan") for Bancomer and Bank of America NT & SA in Concord, California ("BA/Concord")(collectively "Proteinas' U.S. intermediary banks") for Banco Bajio. If the customer is an American company, a transfer is made from the customer's U.S. bank to one of Proteinas' U.S. intermediary banks, and then from the intermediary bank to Proteina's Mexican bank. If the paying customer does not maintain a U.S. banking account, the customer's foreign bank will transfer funds to its intermediary bank in the United States; the customer's intermediary bank then transfers U.S. dollars to Proteinas' U.S. intermediary bank; and finally, Proteinas' U.S. intermediary bank transfers the funds to one of Proteinas' Mexican banks.

The Bank of America EFTs were attached at two different branches that played two different roles in the process outlined above. As noted above, BA/Concord served as the intermediary bank for Proteinas' account at Bank Bajio. As such, BA/Concord froze two payments from customers to Proteinas, both on August 26, 2004: $53,682.21 initiated by Malta Texo de Mexico S. A. de C. V. and $100,000.00 from Scotiabank Inverlat S. A.. In addition, BA/Concord froze two EFTs from Proteinas to third-parties as payments on September 15, 2004 and November 1, 2004.

A different Bank of America branch in Miami ("BA/Miami") served as the primary bank for one of Proteinas' customers, Cargill de Mexico S. A. de C. V. ("Cargill"), and processed payments from Cargill's account to Proteinas. BA/Miami froze three EFTs originated by Cargill to Proteinas Mexican Banks: $229,138.93 destined for Bancomer, $29,104.31 destined for Banco Bajio, and $33,539.43 destined for Banco Bajio. BA/Miami served as Cargill's bank in these transactions, and payment instructions were given by Cargill to BA/Miami to transfer these funds to Proteinas' Mexican banks.

The attached Citibank EFTS are all payments that Proteinas's customers had sent to Proteinas for eventual deposit in its Mexican bank accounts. In these transactions, Citibank was acting as the either the customers' intermediary bank or the customers' U.S. bank. On September 21[2] and 24 and October 8, 2004, Citibank froze three EFTs: $36,526.90 originated by Tron Hermanos S. A. de C. V. of Mexico; $11,968.01 originated by Cognis Corp. of Ohio; and $342,968.43, originated by Pilgrims Pride S. A. de C. V. of Mexico. Finally, on January 4, 2005,

---

[2] Defendant states in its brief that this attachment occurred on September 9, 2004. However, the record submitted shows that the transfer was dated September 20, 2004, and the plaintiff states it did not serve Citibank with the PMAG until September 21, 2004. Compare Def.'s Mem. of Law at 4 with Def.'s Ex. 1, at 3. Accordingly, we conclude the EFT was attached on September 21, 2004. For the purposes of this motion, the exact date of the transaction is immaterial.

Citibank froze two additional transactions--$501,551.26 and $333,414.53, originated by Unilever de Mexico S. de R. L. as payment to Proteinas' account at Bancomer.[3]


## DISCUSSION

### I. Rule B of the Supplemental Rules

Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims ("Rule B") provides a method of obtaining quasi in rem jurisdiction over a defendant by attaching the defendant's property within a district. Rule B reads, in part: "If a defendant is not found within a district, a verified complaint may contain a prayer for process to attach the defendant's tangible or intangible personal property--up to the amount sued for--in the hands of garnishees named in the process." Fed. R. Civ. P. Supp. R. B(1)(a).

Rule B may be invoked only when three prerequisites are met. First, the plaintiff's claim must be an "in personam claim against the defendant which is cognizable in admiralty." Robert M. Jarvis, An Introduction to Maritime Attachment Practice Under Rule B, 20 J. Mar. L. & Com. 521, 526 (Oct. 1989) (hereinafter "Jarvis"). Second, the defendant must not be "found" in the district. Fed. R. Civ. P. Supp. R. B(1)(a). Courts have

---

[3] After the bank attached these funds, HBC realized that it was over-secured and directed that $97,000 of funds be released.

interpreted "not found" to include two requirements: that the court does not have in personam jurisdiction over the defendant under a minimum contacts analysis, and the defendant cannot be served with process in the district. Jarvis, supra at 527. Finally, the property intended to be attached must be located within the district where a PMAG is sought.

In the instant case, Proteinas challenges the attachment of certain EFTs outside the Southern District, the attachment of any EFTs sent by third parties ("sending-payors") to Proteinas as the recipient-beneficiary, and the attachment of any EFTs after it filed a general appearance. When the validity of an attachment is challenged, the burden is on the plaintiff to show why the attachment should not be vacated. Fed. R. Civ. P. Supp. R. E(4)(f).[4] We address each argument for vacating the attachment in turn.

## II. Attachment of EFTs outside this district

Proteinas argues that the EFTs attached by BA/Miami and BA/Concord were never located within this district, and thus are not properly subject to Rule B attachment. HBC does not deny this claim, and instead argues that those EFTs are now properly

---

[4] Under Rule E(4)(f), "any person claiming an interest in [attached property] shall be entitled to a prompt hearing at which the plaintiff shall be required to show why the arrest or attachment should not be vacated." Fed. R. Civ. P. Supp. R. E(4)(f).

attached under a separate PMAG issued by a court in South
Carolina. As it is undisputed that those EFTs attached by
BA/Miami and BA/Concord were not properly attached by the PMAG
issued by this Court on August 25, 2004, Proteinas' motion to
vacate the attachment of those funds by this PMAG is granted.[5]
See Det. Bergenske Dampskibsselskab v. Sabre Shipping Corp., 341
F.2d 50, 52-54 (2d Cir. 1965) (finding that writ of attachment
is invalid as to bank branches outside district issuing writ).


**III.  EFTs were property of Proteinas at time of attachment**

Proteinas contends that the EFTs attached by Citibank were
not its "property" at the time of attachment. The EFTs in
question had been sent by third parties as payments to
Proteinas, with their ultimate destination being one of
Proteinas' Mexican Banks. The attachment of the EFTs, however,
occurred at an intermediary bank prior to Proteinas' receipt of
the funds in its Mexican bank accounts. Accordingly, Proteinas
argues that the EFTs attached were still property of the
sending-payors.

The issue is whether, for purposes of Rule B attachment, an
EFT remains the exclusive property of the sending-payor until it

---

[5] We express no opinion as to the validity of the attachment in South
Carolina.

8

enters one of the banks associated with the recipient-beneficiary. We hold that it does not. Rule B permits a plaintiff "to attach intangible items, such as debts owed to the defendant. Such items may be attached even if they have not yet matured or have only partially matured." Winter Storm Shipping, Ltd. v. TPI, 310 F.3d 263, 276 (2d Cir. 2002) (quoting Jarvis, supra, at 530). The only limitation on such attachment is that "the defendant's entitlement to the credit or interest in the debt must be clear." Id. Because Proteinas has a clear property interest in the debt owed to it, and because the EFT in the hands of the intermediary bank is intended to satisfy that debt, Proteinas has a property interest in the EFT before it is technically possessed by its bank.

In so holding, we adopt the reasoning of Judge Cote in Noble Shipping , Inc. v. Euro-Maritime Chartering Ltd., No. 03 Civ. 6039, 2003 WL 23021974 (S.D.N.Y. Dec. 24, 2003). In Noble Shipping, the defendant challenged the attachment of an EFT sent by a third-party customer as payment to the defendant as a beneficiary, and attached by the plaintiff while the EFT was at an intermediary bank. The defendant contended that the EFT "remained[ed] the property of [the sending payor] because the funds [had] never reached [defendant's] account." Id. at *2. The Noble Shipping court held that "neither the location of the debt at the time of its attachment, nor the fact that this case

arises under maritime law, changes the basic principle that
<u>debts are property subject to attachment</u>." <u>Id.</u> at *3 (emphasis
added).[6]  The fact that the beneficiary-defendant had not yet
received the funds in its bank account did not diminish its
property interest in the EFT, and thus did not invalidate the
attachment. <u>Id.</u>; <u>cf.</u> <u>United State v. Daccarett</u>, 6 F.3d 37, 54-55
(2d Cir. 1993).

Proteinas urges us to ignore the decision in <u>Noble Shipping</u>
as "erroneous."  Def.'s Mem. of Law, at 8.  Proteinas contends
that allowing the attachment of EFTs at an intermediary bank as
property of the recipient-beneficiary conflicts with the Second
Circuit's finding in <u>Winter Storm</u>.  There, the Second Circuit
held that an EFT at an intermediary bank was subject to
attachment as property of the sending-payor. <u>Winter Storm</u>, 310
F.3d at 35.  Accordingly, Proteinas argues that the EFTs sent by
its customers and attached at Citibank remain the property of
the sending-payors:  "[t]he anomalous result of the <u>Noble</u>
<u>[Shipping]</u> decision [that the EFT was property of the recipient-
beneficiary] would be to make EFTs the property of two entities
at the same time."  Def.'s Mem. of Law at 10.

_____

[6] "In addition to tangible property, service of <u>quasi in rem</u> process
can also be used to reach a variety of intangible property, such as
bank accounts, accounts receivable, and other debts owed to the
defendant." 29 <u>Moore's Federal Practice</u>, § 705.04[2][c] (Matthew
Bender 3d ed.).

We find Proteinas' criticisms of <u>Noble Shipping</u> to be misplaced. The Second Circuit's decision in <u>Winter Storm</u> does not require us to find that the intended recipient of an EFT has no property interest in that EFT. <u>Winter Storm</u> did not focus on the issue of ownership of an EFT in the hands of an intermediary bank; instead the decision centered on whether an EFT is sizeable <u>res</u> for attachment purposes. <u>Winter Storm</u>, 310 F.3d at 265. Moreover, in reaching its decision the <u>Winter Storm</u> court "itself relied on a case in which the defendants who sought unsuccessfully to vacate attachment were the intended beneficiaries of the EFT." <u>Noble Shipping</u>, 2003 WL 23021974, at *3 (citing <u>Winter Storm</u>'s reliance on <u>United State v. Daccarett</u>, 6 F.3d 37, 54 (2d Cir. 1993) (approving attachment at intermediary bank of EFTs being sent to defendant beneficiaries)).

While the attachment of EFTs in the hands of an intermediary as property of either the sending-payor and the recipient-beneficiary might appear peculiar, it is the logical result of the broad terms of Rule B's attachment language coupled with the overlapping property rights of sending-payors and recipient-beneficiaries in EFTs. <u>See</u> <u>Winter Storm</u>, 310 F.3d at 276 ("It is difficult to imagine words more broadly inclusive" than that of Rule B); <u>see also</u> Donald I. Baker et al., <u>The Law of</u>

11

Electronic Fund Transfer Systems, ¶ 30.03[2][c]-[3] (2004 ed.)(describing difficulty in determining the competing rights of parties in a wire transfer and in pinpointing when "payee [beneficiary] has irrevocable right to claim the funds"). Rule B is intended to impact any property in which the defendant has a legal interest. Nothing in the language of Rule B requires that the property attached be the exclusive property of the defendant, nor that we adjudicate the competing property interests of the sending-payor and the recipient-beneficiary in an EFT at an intermediary bank.

In this case, Proteinas had a clear legal interest in the EFTs attached, and the attachment of the EFTs as property of the defendant was valid.


**IV. Filing a general appearance does not end the effects of a valid PMAG**

Proteinas argues that its filing of a general appearance negates HBC's right to any attachments after that date. Proteinas contends that once the general appearance is filed, the defendant is "found" within the district under the meaning of Rule B, and therefore no further funds should be attached. Accordingly, Proteinas moves to vacate the EFTs frozen after its appearance on September 23, 2003.

It is widely recognized that the attachment provisions of

to file an appearance, but grants HBC the right to attach property "up to the amount sued for." Fed. R. Civ. P. Supp. R. B(1)(a). Accordingly, "[t]he right to attachment is not defeated by the filing of a general appearance." Constr. Exp. Enters, 558 F. Supp. at 1375; see also Ythan Ltd. v. Ams. Bulk Transp. Ltd., 336 F. Supp. 2d 305, 308 (S.D.N.Y. 2004)("The subsequent appearance [of defendant] had no effect in eviscerating the already effective attachment, including its post-levy effects.").

Given that process in this case was appropriate, the banks' continued actions to attach funds under that order conform with Rule B's language allowing funds to be attached "up to the amount sued for." Fed. R. Civ. P. Supp. R. B(1)(a). The fact that defendant later filed a notice of appearance does not change the post-levy effects of the properly-served PMAG.

**CONCLUSION**

For the aforementioned reasons, Proteinas' motion to vacate the attachment is granted with respect to funds attached by Bank of America, and denied with respect to the funds attached by Citibank.

**IT IS SO ORDERED.**

DATED:    New York, New York
          May 3, 2005

                                        NAOMI REICE BUCHWALD
                                        UNITED STATES DISTRICT JUDGE

13

Copies of the foregoing have been mailed on this date to the following:

Counsel for Plaintiff
Jeremy Harwood
Jack Greenbaum
Jana Byron
Healy & Baillie, LLP
61 Broadway
New York, NY 10006-2701

Counsel for Defendant
Michael Unger
Lawrence Kahn
Freehill Hogan & Mahar, LLP
80 Pine Street
New York, NY 10005-1759